**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest VIGIL, Defendant-Appellant.
No. 685–69.**

United States Court of Appeals,
Tenth Circuit.

Sept. 1, 1970.

Rehearing Denied Oct. 8, 1970.

Eugene Deikman, Denver, Colo. (Harry K. Nier, Jr., Denver, Colo., on the brief), for defendant-appellant.

Gordon L. Allott, Jr., Asst. U. S. Atty. (James L. Treece, U. S. Atty., on the brief), for plaintiff-appellee.

Before PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Vigil and Gilbert Roy Quintana were tried on an indictment which charged that they did "resist, oppose, impede and interfere with Wallace Allen, a deputy United States marshal," while he "was engaged in and on account of the performance of his official duties, in violation of" 18 U.S.C.A. § 111.

They were tried jointly. The jury was unable to agree on a verdict as to Quintana. It found Vigil guilty. From a judgment of conviction, Vigil has appealed.

A space on the second floor of the New Custom House Building in Denver, Colorado, is known as the Armed Forces Examining and Entrance Station. It is where draftees are directed to report for induction into the armed forces of the United States. It is sometimes referred to as the "Induction Center," and we will hereinafter so refer to it.

On February 27, 1969, Vigil went to the Induction Center to report for induction. He was accompanied by Quintana. On their way to the Induction Center, they stopped at the American Friends Service Committee Center and picked up some anti-war literature dealing particularly with the war in Vietnam. They also had some material put out by the Students Non-Violent Coordinating Committee.

When Vigil and Quintana arrived at the Induction Center, they began to pass out the literature referred to above, which they brought with them to the Induction Center, and which was in the form of pamphlets.[1]

---

[1]. 40 U.S.C.A. § 318a. reads as follows:

"The Administrator of General Services or officials of the General Services Administration duly authorized by him are authorized to make all needful rules and regulations for the government of the Federal property under their charge and control, and to annex to such rules and regulations such reasonable penalties, within the limits prescribed in section 318c of this title, as will insure their enforcement: *Provided*, That such rules and regulations shall be posted and kept posted in a conspicuous place on such Federal property."

On May 11, 1966, the General Services Administration promulgated rules and regulations governing public buildings and grounds. Paragraphs 1, 2 and 9 of such rules and regulations, in part here pertinent, read:

"1. AUTHORITY. These rules and regulations are promulgated pursuant to Public Law 566, 80th Congress, approved June 1, 1948 (40 U.S.C. 318), and the Federal Property and Administrative Services Act of 1949 (63 Stat. 377) as amended.

"2. APPLICABILITY. These rules and regulations apply to all Federal property under the charge and control of the General Services Administration and to all persons entering in or on such property. * * *

\* \* \* \* \*

"9. SOLICITING, VENDING, DEBT COLLECTION, AND DISTRIBUTION OF HANDBILLS. * * * Distribution of material such as pamphlets, handbills, and flyers is prohibited without prior approval of authorized individuals."

Such rules and regulations were posted in conspicuous places at the New Custom House Building and at the Induction Center on February 27, 1969.

John Fancher was a Federal Building Guard at a complex of three Federal Buildings, which included the Post Office, the United States Court House, and the New Custom House, on February 27, 1969. On that date he went to the Induction Center to investigate the activity of Vigil and Quintana. Upon his arrival at the Induction Center, and in the presence and hearing of Vigil and Quintana, he was told by a member of the military personnel that Vigil and Quintana were passing out pamphlets. Fancher told them that they could not do that on Government property and they would have to get off of Government property to pass out the pamphlets. He was told by one of the military personnel that Vigil had to remain for induction. He then directed Quintana to please leave the building, and took hold of his arm to escort him out of the building. Quintana said something in Spanish and jerked away from Fancher. Fancher then telephoned Thomas M. Cooper, Supervisor of the Security Guards at the Federal Building Complex, and asked for assistance. Cooper was advised that Fancher was having difficulty in getting persons who were distributing pamphlets at the Induction Center to desist from so doing. When Cooper arrived at the Induction Center, there were present military personnel clerks, military personnel, and Vigil and Quintana. In the presence and hearing of Vigil and Quintana, Fancher reported that they were passing out pamphlets. Quintana had a large number of the pamphlets in his possession. Cooper asked him to please discontinue passing out the literature and to leave the building. Quintana asked Cooper what authority he had to put him out of a Federal Building. Cooper replied because of the activities Quintana was engaged in at that time. Cooper then took hold of the arm of Vigil and the arm of Quintana and started to the door of the Induction Center. One of the military personnel told Cooper that Vigil was there for induction. Cooper then released Vigil and again asked Quintana to leave the building and

again took hold of his arm. Quintana broke loose and pushed Cooper over against the door of the Induction Center. Quintana approached Cooper with his fists drawn up in a position like a boxer. Cooper cautioned Quintana against that kind of action. Quintana then came over to Cooper and pushed his chin up against Cooper's face and pointed at his chin. Cooper then went to the telephone in the next room and called the Buildings Manager, but he was at lunch. However, someone called the United States Marshal's office and said that the Building Guards needed assistance in the New Custom House Building.

Deputy United States Marshals Allen and Hopper responded to the call. Hopper went to one end of the building corridor and Allen went to the other end. Each started up the stairway which led to the corridor on which the Induction Center was located. In the meantime, Vigil and Quintana had come out of the Induction Center and were in the corridor on the second floor.

As Deputy Allen arrived at the top of the stairs leading to the Induction Center, Cooper returned to the scene from the room to which he had gone to telephone the Buildings Manager. There were present, also, Fancher, military personnel, and persons in civilian dress. In the presence and hearing of Quintana, Cooper told Allen that Quintana had refused to leave the building, and that he wanted him arrested for a "disturbance." Allen told Quintana that he was a Deputy United States Marshal, showed him his badge of authority and picture of identification, and told Quintana he was under arrest. Quintana started to leave the area and Allen took hold of one of his arms. Quintana told Allen he could walk under his own power and attempted to pull loose from Allen's grasp on his arm. There was a scuffle, as Allen tried to put handcuffs on Quintana, and Vigil struck Allen and jumped onto his back. Cooper pulled Vigil off Allen's back. The struggle continued and Vigil again jumped on Allen's back and Allen went down on his

knees, but still retained his hold on Quintana's arm. Vigil was again removed from Allen's back and Hopper arrived and put handcuffs on Quintana. Allen observed that several persons had hold of Vigil. He arrested Vigil and put handcuffs on him.

Allen had several bruises in the area of his jaw and ear on one side of his face. At no time did Allen strike Quintana or Vigil.

The court instructed the jury that the United States conceded that the arrest of Quintana was illegal, because it was purportedly for a misdemeanor not committed in the "presence of the arresting officer," but that "in itself does not mean" that Deputy Allen was not engaging in the performance of his official duties when he arrested Quintana; that "a Deputy Marshal is engaged in the performance of his official duties when he is acting within the scope of" the duties of a Deputy Marshal,[2] and that "he does not lose his official capacity if the arrest he made is subsequently adjudged by the Court to be an illegal arrest."

He further instructed the jury that a "person has a right to resist" his "illegal arrest with reasonable force."

After the jury was unable to agree on a verdict as to Quintana, the charge in the indictment as against him was dismissed.

It is clear from the evidence that Captain Cooper requested Deputy Allen only to arrest Quintana, and that he did not request him to arrest Vigil, who was waiting to be inducted, and that Deputy Allen had no intention of arresting Vigil until after Vigil had twice assaulted him while he was engaged in putting Quintana under arrest; that Deputy Allen arrested Vigil for a felony committed in his presence, rather than a previously committed misdemeanor, and such arrest of Vigil was therefore lawful, unless Vigil had the right to intervene and aid Quintana to resist arrest and used only reasonable force in so doing.

Counsel for Vigil contend that the last sentence of Paragraph 9 of the General Services Administration rules and regulations governing public buildings and grounds, quoted above, violates the right of freedom of expression guaranteed by the First Amendment to the Constitution of the United States, and therefore the arrests of Vigil and Quintana were unlawful.

■ The right of freedom of expression is not unqualified, but since Vigil was not arrested for a violation of the last sentence of Paragraph 9, but for assaulting Deputy Allen, and Quintana's arrest was admited by the United States to be illegal, because it was for a misdemeanor not committed in Deputy Allen's presence, we are not required to pass on the Constitutional validity of the last sentence of Paragraph 9.

Substantial evidence was introduced by the United States, which was clearly sufficient to warrant the jury in finding, in its consideration of the charges against Vigil, that Quintana resisted arrest and that Deputies Allen and Hopper used no unnecessary or unreasonable force in arresting him, and that Vigil, in attempting to aid Quintana to resist arrest, violently assaulted Deputy Allen by striking him and by twice jumping on his back.

The court instructed the jury that "a bystander has no right to intervene in the arrest of another if there is reason for him, the bystander, to be aware that the arrest is being made by an official, and in this case by a Deputy United States Marshal."

Vigil relies on the decision of the Supreme Court of the United States in John Bad Elk v. United States (decided April 30, 1900), 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874. In that case, Elk was convicted of the murder of John Kills Back on the Pine Ridge Indian

---

2. "A United States marshal and his deputies, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof." 80 Stat. 620, 28 U.S.C.A. § 570.

Reservation in South Dakota. The facts were these:

Both Elk and John Kills Back were Indians residing on the reservation, and were Indian policemen.

On March 8, 1899, Elk fired two shots from his gun at a place near where he resided. One Gleason, who said he was called an "additional farmer" on the reservation, heard the shots. In response to Gleason's inquiry, Elk admitted he had fired the shots. Gleason said to Elk, "Come around to the office in a little while, and we will talk the matter over." After several days had transpired and Elk had not come to the office, Gleason orally instructed John Kills Back and two other Indian policemen, High Eagle and Lone Bear, "to go and arrest" Elk "at his mother's house nearby, and take him to the [reservation] agency, some twenty-five miles distant." There was no evidence that a complaint had been filed charging Elk with an offense, or that he had violated any rule or regulation in effect on the reservation.

The three Indian policemen went to Elk's mother's house and Lone Bear told Elk they were directed to take him to the reservation agency. Elk replied "All right," but that he had been looking after several Indian schools in the performance of his duties that day and his horse was "used up," but he would borrow one from his brother. Elk went to his brother's home, but because the brother's horses were out on the range, there was delay in obtaining one for Elk. When the Indian policemen returned again to Elk's mother's house, Elk told them about the delay, and said he would go with them to the agency the next morning. On being apprised of those facts by the Indian policemen, Gleason directed them to watch Elk and see that he did not go away. John Kills Back and High Eagle then returned to Elk's mother's house. Elk testified that as they approached, he went out to meet them and asked them why "they were there bothering me all the while for." John Kills Back said, "You are a policeman, and know what the rules are." Elk replied, "Yes; I know what the rules are, but I told you that I would go to Pine Ridge Agency in the morning." Elk testified that thereupon John Kills Back "moved a little forward, and put his hand around as if to reach for his gun. I saw the gun and shot; * * and John Kills Back and High Eagle ran off"; that "John Kills Back fell after he had gone a short distance," and "I shot because I knew that they * * * would shoot me. I saw their revolvers at the time I shot."

The trial court charged the jury in part as follows:

"The deceased, John Kills Back, had been ordered to arrest the defendant; hence he had a right to go and make the attempt to arrest the defendant. The defendant had no right to resist him. * * *

* * *

" * * * the deceased, being an officer of the law, had a right to be armed, and for the purpose of arresting the defendant he would have had the right to show his revolver. He would have had the right to use only so much force as was necessary to take his prisoner, and the fact that he was using no more force than was necessary to take his prisoner would not be sufficient justification for the defendant to shoot him and kill him. The defendant would only be justified in killing the deceased when you should find that the circumstances showed that the deceased had so far forgotten his duties as an officer and had gone beyond the force necessary to arrest defendant, and was about to kill him or to inflict great bodily injury upon him, which was not necessary for the purpose of making the arrest."

The Supreme Court held that it could find no statute of the United States or of South Dakota giving any right to Indian policemen to arrest an individual without a warrant on a charge of misdemeanor not committed in their presence. In its opinion, the court said:

" * * * If the officer have [sic] no right to arrest, the other party

might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest. * * * "

The court held that the Indian policemen had no right to attempt to arrest Elk without a warrant; that the instructions of the trial court, referred to above, were erroneous, and reversed the case, with instructions to grant Elk a new trial.

The principle that where a peace officer attempts without a warrant to arrest a person and the arrest is illegal, such person may resist the arrest by using such force as is absolutely necessary to prevent the arrest, although he knows or has reasonable ground to believe that the person attempting the arrest is a peace officer, has met with severe criticism in recent years.[3]

However, the question as to whether Quintana had the right to resist the arrest is not before us. Hence, we do not reach the right of a person to resist his arrest by a peace officer, where the arrest is illegal.

Our question is whether Vigil, a third person, had the right to intervene and resist the arrest of Quintana, when both he and Quintana knew that Allen was a United States Marshal and a peace officer, and when in so doing Vigil violently assaulted Allen by striking him and by twice jumping on his back.

Even the resistance by the person sought to be arrested may result in a melee in the streets, in a house of business, or a public building, as here at the Induction Center, and interrupt the normal use and functioning of the place of attempted arrest. That is all the more true of intervention by a third person. If one third person can intervene, others can. That is likely, as here, to bring about intervention to assist the peace officer and result in a general affray.

 We are of the opinion that where a peace officer is engaged in making an arrest, a third person does not have the right to intervene, and assist the person the officer is endeavoring to arrest to resist the arrest, if the third person knows or has good reason to believe the officer is a peace officer authorized to make arrests, and the officer is not clearly using unnecessary force, even though the arrest is illegal.

We find no decision by a United States court holding that a third person has a right to intervene and resist the attempt of a peace officer to arrest a person, even though the arrest is illegal, where the third party knows or has good reason to believe that the arrest is being made by a peace officer, and the attending facts and circumstances are like those existing in the instant case.

And we know of no state court decision holding that a third person has the right to intervene and assist a person sought to be arrested by a peace officer to resist such arrest, where the facts and circumstances are like those in the instant case.

Our conclusion is supported by United States v. Heliczer, 2 Cir. (February 23, 1967), 373 F.2d 241, where at page 248 the court said:

"A bystander, * * * has no right to intervene if there is reason for him to be aware that the arrest is being made by a peace officer * *."

---

3. United States v. Heliczer, 2 Cir., 373 F.2d 241, note 3 at p. 246 (1967).

Section 5 of the Uniform Arrest Act abrogates such right. Warner, The Uniform Arrest Act, 28 U.Va.L.Rev. 315, 330–331 (1942). Section 304(2) (a) (i) of the American Law Institute's Model Penal Code, adopted by the A.L.I. in 1958, denies such right. See statement of Herbert Wechsler, Chief Reporter for the Code, A.L.I.1958 Proceedings, p. 247.

The right has been abrogated by legislative enactment in Rhode Island (R.I. Gen.Laws Ann. § 12–7–10 (1956)), New Hampshire (N.H.Rev.Stat.Ann. 594:5 (1955)), Delaware (Del.Code Ann. Tit. 11, § 1905 (1953)), and California (Cal. Penal Code § 834a (Supp.1966)); and by judicial decision in New Jersey (State v. Koonce, 89 N.J.Super. 169, 214 A.2d 428 (1965)).

The question of whether a third person may intervene where the peace officer is using violent, excessive, and unnecessary force likely to result in serious injury to the person sought to be arrested is not here presented, and we do not decide it. What we decide is that under the existing facts and circumstances Vigil did not have the legal right to intervene and attempt to assist Quintana in resisting arrest.

What we have said disposes of the objections to the court's instructions and the refusal of the court to give certain requested instructions.

The other questions raised on the appeal have been carefully considered, and we find them to be without merit and not to warrant extended discussion.

Affirmed.