**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Hal Findley MOORE, Defendant-Appellant.**

**No. 72–3181.**

United States Court of Appeals, Ninth Circuit.

Aug. 30, 1973.

Robert J. Hirsh (argued), of Messing, Hirsh & Franklin, Tucson, Ariz., for defendant-appellant.

Sarah Ann Bailey, Asst. U. S. Atty. (argued), William C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before BROWNING and GOODWIN, Circuit Judges, and TAYLOR,* District Judge.

## OPINION

BROWNING, Circuit Judge:

This is an appeal from convictions for possessing marihuana with intent to distribute (21 U.S.C. § 841(a)(1)), and for assaulting a federal officer in the course of his official duties (18 U.S.C. § 111). The prosecution stemmed from an "airport search" in which the marihuana was discovered in appellant's luggage. Following discovery of the marihuana, appellant forcibly resisted the attempts of two federal Customs agents to arrest him. Appellant challenges his conviction for possession on the ground that the search violated his Fourth Amendment rights. He challenges his conviction for assault on the ground that he was privileged to use reasonable force to resist his allegedly unlawful arrest. We agree with the first contention, but reject the second.

I

The facts relevant to the lawfulness of the search are as follows.

Appellant approached the Continental Airlines check-in counter at Tucson International Airport with the apparent intention of boarding Flight 75. Mr. Kohlhoff, Continental's ticket agent, observed that appellant was extremely nervous. When Mr. Kohlhoff asked for identification, appellant produced a medical care identification card, an identification card for federal food coupons, and half of a New York driver's license, all bearing the name "Alan C. Mahoney." Appellant's air ticket was issued to "A. Mahoney." None of the identification documents included information as to Mr. Mahoney's height or weight, or the color of his hair or eyes. Appellant had no other identification. Mr. Kohlhoff asked Mr. Padalino, a Customs agent assisting in the check-in process, to help determine whether appellant was in fact Mr. Mahoney. In response to Agent Padalino's questions, appellant stated that his birthdate was October 14, 1951, although the medical card showed Mr. Mahoney's birthdate as "October 1950"; he said he did not know Mrs. Mahoney's given name ("Catherine" on one of the identification cards), but recalled her "nickname"; and he correctly identified the city and street of Mr. Mahoney's residence, but was unable to recall the street number. Agent Padalino told the Continental employees that in his opinion appellant was not Mr. Mahoney.

Since appellant could not identify himself satisfactorily as the person to whom the airline ticket had been issued, Mr. Kohlhoff told him he would not be allowed to board the plane. Agent Padalino and Customs Agent Hemerka (who was also standing nearby) were told that appellant had been denied boarding.

* Honorable Fred M. Taylor, United States Senior Judge, District of Idaho, sitting by designation.

Appellant demanded the return of his two suitcases. Mr. Kohlhoff left to retrieve them from the plane. According to the agents appellant became increasingly agitated: sweating, trembling, eyes dilated and "glassy," speech slurred. Agent Padalino testified that appellant appeared to be under the influence of alcohol or drugs, or to be ill. Mr. Kohlhoff returned with the two suitcases. The agents noticed that masking tape had been applied around one of the bags and over the keyholes of the other. Appellant took the bags and left hurriedly. As he moved away, he dropped his still-refundable ticket. The agents followed, calling out that they had his ticket, but he did not stop.

The agents caught up with appellant and drew him aside to an unoccupied boarding area. They informed him his bags would have to be searched, and asked him to open them. Appellant produced a key. The agents unlocked one of the bags. Appellant then opened the bag and showed the agents the section containing clothing and personal effects. They asked him to open the other half of the suitcase. He declined, holding down the interior divider. Agent Hemerka pushed him away, opened the compartment, and discovered the marihuana.

The agents then sought to place appellant under arrest. He resisted, assaulting Agent Padalino in a successful effort to free himself, and fled. He was soon recaptured.

Appellant's bag was not searched as part of an administrative screening search of airline passengers' carry-on luggage such as was approved in United States v. Davis, 482 F.2d 893 (9th Cir. 1973). Appellant did not seek to personally carry his bag aboard the plane, and clearly indicated his desire to relinquish the opportunity to board the flight before the search was made. *Id.* at 910.

■■ The search cannot be justified as a permissible "stop-and-frisk" within the limits established by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The circumstances may have warranted stopping appellant to inquire into the possibility of criminal activity. It is less clear that the agents could justify a *Terry* "frisk" by pointing to "particular facts from which . . . [they] reasonably inferred that . . . [appellant] was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L. Ed.2d 917 (1968). But even if a *Terry* "frisk" were warranted, it could extend no further than "a carefully limited search of the outer clothing of . . . [appellant] in an attempt to discover weapons which might be used to assault [the agents]," Terry v. Ohio, 392 U.S. at 30, 88 S.Ct. at 1885, and thus could hardly include an investigation of the contents of appellant's locked suitcase. *See* United States v. Davis, *supra,* 482 F.2d at 907.

■ Finally, the record does not support the government's theory that the agents had probable cause to arrest appellant, and that the search of his bag was therefore a lawful search incident to a valid arrest.

"Probable cause at the time of arrest is determined by examining 'whether at that moment the facts and circumstances within . . . [the agents'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" United States v. Selby, 407 F.2d 241, 242–243 (9th Cir. 1969), *quoting* Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Suspicious conduct is not enough. *See, e. g.,* Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Probable cause is lacking if the circumstances relied on are "susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities." United States v. Kandlis, 432 F.2d 132, 136 (9th Cir. 1970), *quoting* United States v. Selby, *supra,* 407 F.2d at 243.

Appellant's conduct was no more than suspicious. His nervousness, confusion,

and extreme forgetfulness were consonant with intoxication induced by alcohol or drugs, ill health, or extreme but innocent anxiety engendered by a discomforting personal confrontation with the airline employees and government agents. *See, e. g.*, Valenzuela-Garcia v. United States, 425 F.2d 1170, 1172 (9th Cir. 1970); *cf.* Wong Sun v. United States, 371 U.S. 471, 482–484 & n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Rios v. United States, 364 U.S. 234, 255–256, 261–262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). His lack of documentary identification containing a physical description did not contribute materially to an implication of guilt. *See, e. g.*, Jones v. Peyton, 411 F.2d 857, 861 (4th Cir. 1969). The presence of the masking tape was odd, but scarcely sinister. Nothing in the record indicates that appellant knew he had dropped his ticket, or understood the agents' efforts to inform him.

As we have said, appellant may have been a sufficiently "suspicious individual" that the agents might have stopped him briefly, "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). But they lacked sufficient trustworthy information "to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, *supra*, 379 U.S. at 91, 85 S.Ct. at 225.

The motion to suppress should have been granted; appellant's conviction for

possession of marihuana with intent to distribute cannot stand.

## II

The right to resist an unlawful arrest was well established at common law. "If the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." John Bad Elk v. United States, 177 U.S. 529, 535, 20 S.Ct. 729, 731, 44 L.Ed. 874 (1900). "One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." United States v. DiRe, 332 U.S. 581, 594, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948).

We assume this principle remains valid, although much criticized of late.[1] We also assume its availability as a defense to a prosecution under 18 U.S.C. § 111. *Cf.* United States v. Kartman, 417 F.2d 893, 895 n. 5 (9th Cir. 1969); United States v. Grimes, 413 F.2d 1376, 1378–1379 (7th Cir. 1969). We conclude, nonetheless, that it is not applicable to this case.

 The privilege asserted is available only if the arrest was "unlawful." The parties agree that appellant was arrested after the agents discovered the marihuana in his suitcase. The agents then had probable cause to believe that a felony was being committed in their presence. The warrantless arrest was therefore lawful, in itself. It was "unlawful" only in the exclusionary-rule

1. *See, e. g.*, United States v. Ferrone, 438 F.2d 381, 389–390 (3d Cir. 1971); United States v. Vigil, 431 F.2d 1037, 1042 (10th Cir. 1970); United States v. Simon, 409 F. 2d 474, 477 (7th Cir. 1969); United States v. Heliczer, 373 F.2d 241, 246 n. 3 (2d Cir. 1967); *cf.* Government of Virgin Islands v. Duvergee, 456 F.2d 1271, 1272–1273 (3d Cir. 1972). Other cases narrowing the right to resist include United States v. Martinez, 465 F.2d 79, 82–83 (2d Cir. 1972), and United States v. Beyer, 426 F.2d 773, 774 (2d Cir. 1970). *But see* Basista v. Weir, 340 F.2d 74, 82 & n. 7 (3d Cir. 1972); Abrams v. United States, 99 U.S.

App.D.C. 46, 237 F.2d 42, 43 (1956); United States v. Moore, 332 F.Supp. 919, 920 (E. D.Va.1971). The commentators are divided. *See, e. g.*, Note, Defiance of Unlawful Authority, 83 Harv.L.Rev. 626, 636–38, 644–46 (1970); Note, The Right to Resist an Unlawful Arrest, 31 La.L.Rev. 120 (1970); Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale L.J. 1128 (1969); Case Note, 7 Nat.Res.J. 119 (1967); Note, The Right to Resist an Unlawful Arrest: An outdated Concept?, 3 Tulsa L.J. 40 (1966); Warner, The Uniform Arrest Act, 28 Va.L. Rev. 315, 330–31 (1942).

sense that it was "fruit" of the prior unlawful search.

■ We have been cited no authority, and have found none, that permits resistance to an arrest that is unlawful only in this derivative sense. We are unwilling to initiate such an extension of the privilege, at least where, as here, there is no claim of bad faith, unreasonable force, or provocative conduct on the part of the arresting officer. *Cf.* United States v. Vigil, 431 F.2d 1037, 1042–1043 (10th Cir. 1970).

The purposes of the privilege would not be served by doing so.

One such purpose is to deter abuses of police authority.[2] The risk of possible physical resistance to a subsequent arrest can have little tendency to deter the prior unlawful search. The relationship is too remote to add measurably to the deterrent effect of the officers' presumed knowledge that the arrest will be futile in any event since the evidence resulting, directly or indirectly, from the unlawful search will be suppressed. There may be a slightly greater possibility that the availability of the privilege would deter the arrest itself, but it is questionable whether it would be desirable to discourage an officer from making an arrest after a serach, albeit unlawful, has demonstrated that a felony is being or has been committed. At that point the resolution of often difficult issues relating to the lawfulness of the search are surely best left to subsequent court proceedings.

The second general purpose of the privilege is to preserve the sense of personal liberty and integrity inherent in our system of constitutional government by protecting from punishment persons who reasonably resist unlawful intrusions by government agents.[3] But again, where a search has disclosed that a felony is or has been committed, a subsequent arrest for that offense is hardly a proper occasion for self-righteous resistance—excluding, of course, instances of bad faith, unreasonable force, or provocative conduct by the arresting officer.

The conviction under 21 U.S.C. § 841(a)(1) is reversed. The conviction under 18 U.S.C. § 111 is affirmed.

2. "Although a significant array of reasons exist for abolishing the right, there are numerous reasons for its retention. One such reason is that the proposed change might possibly foster conditions inherent in a police state. The new law could be an instrument of oppression. Armed with such a statute a policeman, even for reasons of prejudice or whim, could attempt to make a patently false and provocative arrest and thereby infuriate the average citizen into some form of resistance. Thereafter, the citizen could be charged with resisting arrest, which would be a crime regardless of the invalidity of the initial attempted arrest." Note, The Right to Resist an Unlawful Arrest, 31 La.L.Rev. 120, 122–23 (1970). *See* Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale L.J. 1128, 1128, 1138 (1969).

3. "The right to resist unlawful arrest memorializes one of the principal elements in the heritage of the English revolution: the belief that the will to resist arbitrary authority in a reasonable way is valuable and ought not to be suppressed by the criminal law. In the face of obvious injustice, one ought not to be forced to submit and swallow one's sense of justice. More importantly, it is unconscionable to convict a man for resisting an injustice. This is indeed a value judgment, but the values are fundamental." Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale L.J. 1128, 1137–38 (1969).

"The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be one of laws, and not of men. Unless it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental." *Id.* at 1147.