635 So.2d 168 (1994)
STATE of Louisiana
v.
Robert L. STOWE.
No. 93-K-2020.
Supreme Court of Louisiana.
April 11, 1994.
Dissenting Opinion April 12, 1994.
*169 Arthur Gilmore, Jr., Monroe, for applicant.
Richard P. Ieyoub, Atty. Gen., John Reed Walters, Dist. Atty., for respondent.
Dissenting Opinion of Justice Ortique April 12, 1994.
*170 MARCUS, Justice.[*]
Defendant was charged by bill of information with the offense of second degree battery. After trial by jury, defendant was found guilty as charged, and was sentenced to serve 60 months at hard labor. Defendant appealed his conviction and sentence. The court of appeal affirmed in an unpublished opinion.[1] Upon defendant's application, we granted certiorari to consider the correctness of that decision, being particularly interested in the sufficiency of evidence issue.[2]
On the afternoon of September 4, 1991, Officer Gary Taylor of the Olla Police Department responded to a report of an injured person walking along Highway 125. Upon arriving at the scene, Officer Taylor observed two men, Reverend Allen Scott McDowell, who was responsible for placing the call, and defendant. Defendant, who was in an intoxicated state, had earlier had a fight with his wife and apparently punched through a window, resulting in a deep cut on his right arm which was dripping blood. Officer Taylor wrapped a towel around defendant's arm in an attempt to stop the blood flow. Defendant responded in a belligerent manner, cursing very loudly. Officer Taylor attempted to reason with him and tried to take him to get medical attention for his arm. Defendant refused and became increasingly hostile and threatening. Traffic began to back up, since defendant and the officer were standing in the middle of the highway. Realizing that he was unable to reason with defendant, Officer Taylor advised him that he was under arrest for disturbing the peace. At this point, defendant suddenly hit Officer Taylor in the head, knocking him backwards across the road and into a roadside ditch. The officer attempted to remove his ASP (an expandable metal baton) from his belt, but was unable to use it. Defendant continued to hit the officer. Defendant grabbed the end of the officer's ASP and the two began wrestling for it. The officer was able to get it away from defendant and it dropped to the ground. Finally, Officer Taylor was able to pin defendant's arm down. With the assistance of Reverend McDowell and a bystander, Ken Evans, the officer put his handcuffs on defendant and placed him in his patrol car.
Officer Taylor was treated in the emergency room of Hardtner Medical Center by Dr. B.E. Doughty. Dr. Doughty's report revealed that Officer Taylor had an edema and contusion under his right eye, abrasions on his forehead, lip and under his right eye and contusions and some edema on his forehead. His wounds were cleaned and his abrasions treated with neosporin ointment. He was instructed to use an ice pack on the forehead and right eye area, apply neosporin ointment to the abrasions and under the right eye and the sheriff's office was asked to check with him every two hours. Officer Taylor received no further treatment, although he stated he had severe headaches for approximately two weeks after the incident and had difficulty sleeping.
Three issues are presented for our consideration: (1) whether there was sufficient evidence to support a conviction for second degree battery; (2) whether the trial court erred in denying introduction of certain medical records of defendant into evidence; and (3) whether defendant received ineffective assistance of counsel.

Sufficiency of Evidence
Defendant contends that the state failed to prove he committed second degree battery. Specifically, he argues that the state failed to prove that the victim suffered extreme physical pain. The offense of second degree battery is set forth in La.R.S. 14:34.1:
Second degree battery is a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury.
For purposes of this article, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of *171 the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
Whoever commits the crime of second degree battery shall be fined not more than two thousand dollars or imprisoned, with or without hard labor, for not more than five years, or both.
We have held that the phrase "extreme physical pain" as used in the statute is not unconstitutionally vague, since it "describes a condition which most people of common intelligence can understand." State v. Thompson, 399 So.2d 1161, 1168 (La.1981). In State v. Fuller, 414 So.2d 306, 310 (La.1982), we held that second degree battery is a specific intent crime, and that such intent "may be inferred from the circumstances of the transaction."
When considering a claim of insufficient evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Smith, 600 So.2d 1319 (La. 1992). It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Rosiere, 488 So.2d 965 (La.1986).
In order to prove its case, the state relied on the testimony of Officer Taylor, and two eyewitnesses to the incident, Reverend Allen McDowell and Ken Evans. In addition, the state introduced the testimony of Chief of Police Bobby W. Cruse, who transported Officer Taylor to the hospital, and photographs of Officer Taylor taken shortly after the incident. Officer Taylor testified as follows:
Q: Officer Taylor, while Mr. Stowe was hitting you did you feel his blow on your face?
A: Definitely.
Q: What did they feel like?
A: Felt like I was getting hit up side the head with a baseball bat.
* * * * * *
Q: Tell us what it felt like?
A: Every time he hit me I just felt a great deal of pain up to the point where I finally became numb. I was hurting so bad that I was having difficulty seeing, my vision was bad, had so much blood in my face. At that time I thought it was mine, some of it might have been mine, some of it might have been Mr. Stowe's. I have no way of determining what was what.
Q: Where did Mr. Stowe hit you at?
A: All over the face and head.
* * * * * *
Q: Officer Taylor, what was your impression of the fight that took place?
A: I felt like I was fighting for my life...
The officer's version of the story was corroborated by the testimony of two eyewitnesses, Ken Evans and Reverend McDowell. Mr. Evans testified as follows:
Q: Mr. Evans were you in a position that you could see what was taking place during this incident?
A: I saw the whole thing.
Q: What was your impression of what took place?
* * * * * *
A: Well here was a man hurt, here's a police officer coming to help him, trying to help him, trying his best to help him and I just watched this guy just explode on this police officer trying to kill him, trying to break him into [sic]. My recollections of the whole thing is sickening because if he could have he would have killed that guy. He was trying to kill him and that is my recollection of what I saw.
Reverend McDowell testified that he saw defendant hit Officer Taylor in the head "probably four or five times" without any provocation from the officer. Like Mr. Evans, he stated that defendant was "whipping up" on the officer, was repeatedly "hitting him with his fist" and "was getting the best of him."
As to his condition, Officer Taylor testified:
Q: What was the condition of your face when you got to the hospital?

*172 A: One eye was swelled nearly completely shut. There were bruises and abrasions all over my face. Knots on my head, had a large knot on my chin and I still have a small knot on my chin from this. Had a large place under my eye. It stayed there for about two weeks before it finally started going down. Both eyes were blackened. Had a nose bleed and a cut lip.
Q: You previously testified that this hurt. For how long a period did you hurt from this?
A: I had severe headaches approximately two weeks, night and day. It was very little sleep that I get during that time. There was no way to be comfortable at all.
Q: Did you have these headaches prior to this incident?
A: No.
The description given by Chief Cruse, who saw Officer Taylor immediately after the incident, was similar: "his face was severely beaten, his eyes was already swollen shut, had bruises upon his face, lacerations and bleeding." The photographs of Officer Taylor taken shortly after the incident are in accord with this testimony.
The defense offered no testimony to contradict the version of the incident testified to by Officer Taylor, Reverend Allen and Mr. Evans. The defense presented the testimony of defendant's wife, Phyllis Stowe, his sister-in-law, Peggy Whitman, his son, Ricky Stowe, and his daughter, Shannon Stowe, none of whom were present when the altercation started. Mrs. Stowe testified that Officer Taylor told her he was "bruised up" and would be "sore tomorrow," but the only thing he was sorry about was that his uniform was ruined. Ms. Whitman testified that Officer Taylor denied being hurt, stating he was "just mad." The defense also put on the testimony of Dr. Doughty, the physician who treated Officer Taylor. Dr. Doughty's report indicated that at the time he was treated Officer Taylor denied he was in pain. However, Dr. Doughty admitted that he had patients who denied pain even though it was obvious that they were in pain.
Having reviewed the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that the state proved that defendant intentionally inflicted extreme physical pain on Officer Taylor without his consent.[3]

Exclusion of Evidence
Defendant contends that the trial judge erred in excluding introduction of his medical records into evidence. Defendant sought to introduce the records to support his theory that he was attempting to resist an unlawful arrest and the injuries he received were defensive in nature. The state objected to the introduction of the records on the ground they were not relevant. The trial judge sustained the state's objection, but allowed defendant to make a proffer. The trial judge also allowed the treating physician, Dr. Doughty, to testify before the jury as to his examination of defendant and as to the specifics concerning defendant's arm injury. The record indicates that Dr. Doughty testified before the jury that defendant had a four inch laceration to his right forearm and wrist area, contusion abrasions to the left knee and thigh and contusions to the right and left chest and front. He observed that the lacerated tendon weakened the function of closing the palm. A review of the proffered information indicates that the medical records contained essentially the same information as Dr. Doughty testified to before the jury. The only additional information in the proffer concerned the results of defendant's skull x-ray, which was negative, and a report from a registered nurse concerning vomiting by defendant at approximately 7:30 p.m. on *173 the night of the incident. The report shows that as a result of the vomiting, defendant was examined again; however, no unusual conditions were found and defendant was discharged to the sheriff's department at 8:20 p.m.
The definition of relevant evidence is set forth in La.Code Evid. art. 401:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
In determining the relevance of evidence, much discretion is afforded to the trial judge. State v. Johnson, 343 So.2d 155 (La.1977); State v. Nero, 319 So.2d 303 (La.1975).
Having reviewed the proffered materials, we find that the additional information in the proffer which was not included in Dr. Doughty's testimony before the jury does not lend any support to defendant's assertions that his injuries were defensive in nature. Arguably, however, defendant's medical records were relevant insofar as they showed his cut tendon weakened his ability to make a fist and made it difficult for him to hit Officer Taylor. Nonetheless, we find any error in this regard was harmless, since the jury was fully informed of defendant's cut tendon and his weakened ability to make a fist through the testimony of Dr. Doughty.

Ineffective Assistance of Counsel
Finally, defendant contends he received ineffective assistance of counsel, since his attorney failed to raise the issue of whether his highly intoxicated state at the time of the incident precluded the presence of specific intent. Defendant additionally argues that the defense counsel failed to request a special jury charge regarding the defense of intoxication. In rejecting this contention, the court of appeal held:
As the evidence presented at trial and alleged by the defendant in brief did not indicate a level of intoxication sufficient to preclude the presence of specific intent, defendant's counsel was not ineffective in failing to present evidence of intoxication or to request a special jury charge concerning intoxication.
An ineffective assistance of counsel claim may be addressed on direct review if the record discloses evidence needed to decide the issue. State v. Ratcliff, 416 So.2d 528, 530 (La.1982) (record was sufficient since ineffective assistance claim was explored in detail during a hearing on a motion for new trial). However, the issue is more properly raised by application for post-conviction relief in the trial court, where a full evidentiary hearing may be conducted if warranted. State v. Deloch, 380 So.2d 67 (La. 1980); State v. Malveaux, 371 So.2d 820 (La. 1979).
In the present case, the record does not contain sufficient evidence to resolve defendant's ineffective assistance of counsel claim on direct review. The court of appeal erred in passing on this issue. Accordingly, we will vacate and set aside that portion of the court of appeal's judgment dealing with this issue. Defendant may re-raise this issue by application for post-conviction relief in the trial court.

DECREE
For the reasons assigned, the judgment of the court of appeal is vacated and set aside insofar as it passes on defendant's ineffective assistance of counsel claim. In all other respects, the judgment of the court of appeal is affirmed.
LEMMON, J., concurs and assigns reasons.
DENNIS, J., dissents with reasons.
CALOGERO, C.J., dissents for reasons assigned by DENNIS, J.
ORTIQUE, J., dissents and assigns reasons.
LEMMON, Justice, concurring.
I join in the majority opinion except that part which perpetuates this court's error in State v. Fuller, 414 So.2d 306 (La.1982), by classifying second degree battery as a specific intent crime. La.Rev.Stat. 14:34.1 proscribes "intentionally" inflicting serious bodily injury, thereby distinguishing the conduct *174 necessary for this crime from conduct which accidently inflicts serious bodily injury. Only general intent, and not specific intent, needs to be proved as an element of second degree battery.[1]
DENNIS, Justice, dissenting.
I respectfully dissent.
To convict the defendant of second degree battery, the state was required to prove one of the following: (1) unconsciousness; (2) extreme physical pain; (3) protracted and obvious disfigurement; (4) protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or (5) substantial risk of death. The majority concedes that the state failed to prove (1) and (3) through (5), but takes the position that the state proved that the victim suffered "extreme physical pain." Because these words are used in a crime definition they must be construed strictly against the state. Therefore, the term cannot be equated with "substantial," "serious," or even "severe" physical pain. Instead, it must be taken to mean pain that is situated at or marks the end of the range of pain that a victim may suffer in a non-aggravated battery. Obviously, the victim in the present case did not suffer pain of such magnitude; that is, he did not suffer pain equal to or similar to the highest degree of pain suffered by victims in the range of non-aggravated batteries. The victim did not lose consciousness; he denied that he was in pain; he required only a brief visit to the emergency room; he went back to work immediately; he sought no further medical attention; he lost no time from work; and he was not permanently disabled. Furthermore, the treating physician was of the opinion that the victim was not in extreme physical pain. Consequently, the evidence in this case was constitutionally insufficient to support a conviction of second degree battery.
ORTIQUE, Justice, dissenting.
I respectfully dissent.
I do not perceive that the defendant acted as monstrously as depicted by the majority. Au contraire, I discern a deeply disturbed individual who was consumed with emotional hurt and, therefore, oblivious to the physical hurt portended by his bleeding forearm. I perceive an individual who, while walking down the road, was seeking solace within himself, minding his own business, disturbing no one.
After a man of the cloth became concerned about defendant due to his injured forearm, he offered defendant assistance. Defendant declined his assistance, as well as that offered by the law enforcement officer who had been called to the scene by the clergyman. Defendant made it apparent to all of his "rescuers" that he did not require their assistance and resented their interference in his internal misery. Nonetheless, his rescuers persisted in their attempts to force medical attention on him until traffic backed-up. After these rescuers created a spectacle, causing traffic to back-up, the determined officer thought to win the now public battle of wills by placing defendant under arrest. Defendant, however, did not yield to this unlawful exercise of governmental power. He resisted by detaching the officer's status, by removing the officer's baton and tossing it into the nearby field, thereby, reducing the situation to merely a "man to manall american physical confrontation." In my opinion, at all times, defendant acted like a man who desired to be left alone but was compelled to fend off well-intentioned, but clearly unwanted interference to achieve his objective.
The officer's refusal to leave defendant alone was an unconstitutional seizure of his person in violation of the 4th Amendment of the United States Constitution and Article 1, § 5 of the Louisiana Constitution of 1974. These provisions guarantee a citizen's right to be free of unwarranted seizures of their person. Implicit within their protection is the restraint on officers from detaining law abiding citizens against their will and from forcing on them unwanted attention or assistance. Herein, the officer offered defendant a towel to stem the bleeding. Defendant apparently agreed to accept this assistance. Then the officer insisted on doing moreto aid defendantto impress the clergyman or to satiate his own ego? The officer detained *175 defendant, in an unwarranted determination to impose his will on the defendant.
Defendant had not violated any law. He merely had walked down the road injured. Any drunkenness on his part had not disturbed the peace, i.e., his actions had not "foreseeably disturb[ed] or alarm[ed] the public" within the meaning of LSA-R.S. 14:103. Rather, defendant's "crime" was bleeding in public and not accepting the additionally offered aide. It was only in retaliation of the officer's continuous and persistent breech of his constitutional right to be left alone and free of unwanted governmental interference, that defendant used any offensive or derisive words. Thus, while I do not condone the manner in which defendant expressed it, I respect his defense of his constitutional rights.

Right to be Left Alone
The 4th Amendment of the United States Constitution and Article 1, section 5 of the Louisiana Constitution protects citizens from unreasonable searches and seizures. Implicit within this protection is a legal restraint upon the police from approaching citizens "under circumstances that make it seem that some form of detention is imminent unless they have probable cause to arrest the individual or reasonable grounds to detain the individual." State v. Saia, 302 So.2d 869, 873 (La.1974), cert. den., 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). Admittedly, the police have the right to engage anyone in conversation, even without reasonable grounds to believe that the individual may have committed a crime. Concomitantly: "Police conduct involving an encounter with a citizen imposes a restraint only if the police have attempted to encounter or detain a citizen against his will; mere incident of a police officer encountering an individual in a public place does not, in and of itself, restrain an individual's `freedom to walk away.'" State v. Duplessis, 391 So.2d 1116 (La.1980).
La. Const. Art. I, section 5 provides:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
"The right to privacy is the right to be left alone, and to live free from unjustified and unreasonable intrusion and interference by governmental interests. It is a fundamental and compelling interest ... It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, and our freedom of association." Baumhart, J.T. Employer's Right to Read Employee E-mail: Protecting Property or Personal Prying?, 8 Lab.Law. 923, n. 126 (1992)The right to privacy also protects "our bodies or autonomy,"[1] and "our freedom to demand that a life sustaining machine be withheld or withdrawn."[2] To protect that right, every unjustifiable intrusion by the state upon the privacy of the individual, whatever the means employed, must be deemed a violation of our constitution or the statute or both. State v. Tucker, 626 So.2d 707, 720 (La.1993) (Dissent, Dennis, J.). When a citizen is actually stopped without reasonable cause or if the stop is imminent, the right to be left alone is violated, resulting in an illegal seizure. State v. Tucker, 626 So.2d 707 (La.1993), reh. den., 626 So.2d 720 (La.1993); State v. Raiford, 600 So.2d 924 (La.App. 4 Cir.1992). When Officer Taylor responded to the call of the clergyman, defendant had not committed a crime nor was there reason to believe a crime was about to be committed. At that point he had a constitutional right to pursue his lawful purposes, notwithstanding his bleeding arm.

The right to refuse medical attention
The mere fact that the police approaches a citizen and addresses him does not compel *176 that citizen to respond to inquiries or to comply with their requests; legally, nothing prevents his choosing not to answer and walk away. State v. Shy, 373 So.2d 145 (La.1979). A person's liberty and privacy are violated when he is no longer free to disregard the questioning of the police and walk away. State v. Raiford, supra.
The police do not have the authority to force anyone, even those who are visibly injured, to receive medical treatment. Ciko v. City of New Orleans, 427 So.2d 80 (La. App. 4 Cir.1983). In determining whether the officer owed a duty to do more than offer assistance, this court should have balanced the interest of defendant to refuse medical treatment against the public's interest in seeing that those in need of medical assistance will receive it.[3] While defendant may have seemed disoriented this did not give the officer the right or the duty to substitute his judgment for that of defendant. Doing so violated defendant's right to refuse treatment, a right which is protected by our constitution, our jurisprudence, and our appreciation of liberty.
The majority suggests that, "based on defendant's offensive and derisive language in the middle of a public highway, plus his visibly intoxicated condition, Officer Taylor was justified in believing defendant was acting `in a manner which would "foreseeably disturb or alarm the public."'" State v. Jordan, 369 So.2d 1347, n. 3 (La.1979). Defendant's words and actions may have justifiably angered Officer Taylor as an affront to his authority. However, there is no evidence that defendant was acting in a manner that was dangerous to himself or to others. He merely refused Officer Taylor's attempt to seize him in an effort to transport him to a medical facility. Moreover, there is no evidence that defendant was gravely disabled, and in need of immediate hospitalization to protect him or others from physical harm. The very facts relied upon by the majority to justify a conviction, however, suggest that defendant was not disabled and that he had complete use of his faculties.

The right to resist an unlawful arrest
Louisiana has long held to the rule of law that a citizen has the right to resist an unlawful arrest. State v. Lindsay, 388 So.2d 781 (La.1980); City of New Orleans v. Lyons, 342 So.2d 196 (La.1977). In this state, the right to resist an unlawful arrest is even considered statutory as it has been codified in LSA-R.S. 14:108 and LSA-C.Cr.P. art. 220. Id. This court proclaimed Louisiana's attitude on the right to resist an unlawful arrest in City of Monroe v. Ducas, 203 La. 971, 14 So.2d 781, 784 (1943), stating that:
The right of personal liberty is one of the fundamental rights guaranteed to every citizen, and any unlawful interference with it may be resisted. Every person has the right to resist an unlawful arrest; and, in preventing such illegal restraint of his liberty, he may use such force as is necessary.
Herein, defendant's right to personal liberty was in competition with the officer's abusive and self-proclaimed power. See City of New Orleans v. Lyons, 342 So.2d at 200. Personal liberty must prevail. Therefore, the price of exposing the officer to retaliatory force should be borne by the officer,and societyin order to protect the personal liberty of a citizen whose conduct violates no law. See Id.
To the extent that Officer Taylor wished to be helpful, his deeds are to be applauded. But to take unwarranted advantage of another, under color of being helpful or under color of law is importunately disputatious.
In United States v. Moore, 483 F.2d 1361, n. 3 (9th Cir.1973), the federal court quoted the following two passages from Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale L.Rev. 1128 (1969), which epitomize my opinion of the right to resist an unlawful arrest:
"The right to resist unlawful arrest memorializes one of the principal elements in the heritage of the English revolution: the belief that the will to resist arbitrary authority in a reasonable way is valuable and ought not to be suppressed by the criminal law. In the face of obvious injustice, one ought not to be forced to submit and swallow one's sense of justice. More importantly, it is unconscionable to convict a *177 man for resisting an injustice. This is indeed a value judgment, but the values are fundamental." 78 Yale L.Rev. at 1137-38.
"The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be one of laws, and not one of men. Unless, it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental." 78 Yale L.Rev. at 1147.
Thus, it is my opinion that the officer violated defendant's constitutional right to be left alone and free of unwanted or unwarranted governmental interference; that defendant's conduct did not violate LSA-R.S. 14:103 and, therefore, this defendant merely exercised his constitutional and/or statutory right to resist an unlawful arrest.
Under the facts, as I perceive them, the contest of wills should have ended in a draw. No lawful arrest was made. Society's demand for vengeance under these circumstances is egregious.
I dissent.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Kimball, J. was not on the panel which heard and decided this case.
[1] 617 So.2d 997 (La.App. 3rd Cir.1993).
[2] 627 So.2d 642 (La.1993).
[3] Defendant argues the officer's decision to "force his will" upon him after he refused the officer's assistance meant the officer "impliedly consented" to this physical confrontation. In essence, defendant argues he was simply exercising his right to resist an unlawful arrest. We find no merit to this argument. Clearly, based on defendant's offensive and derisive language in the middle of a public highway, plus his visibly intoxicated condition, Officer Taylor was justified in believing that defendant was acting "in a manner which would `foreseeably disturb or alarm the public.'" State v. Jordan, 369 So.2d 1347, 1350 (La.1979). Therefore, Officer Taylor had probable cause to arrest him for violating La.R.S. 14:103, disturbing the peace. Since Officer Taylor was engaged in making a lawful arrest, he did not consent to the battery.
[1] When specific intent is required, the Legislature uses words like "specific intent to kill" in La.Rev.Stat. 14:30, or "with intent to defraud" in La.Rev.Stat. 14:72. Use of the word "intentionally" denotes a general intent crime.
[1] See State v. McHugh, 630 So.2d 1259, 1264 (La.1994).
[2] LSA-R.S. 40:1299.58.1 permits certain individuals to declare that life-sustaining procedures may be withheld or withdrawn ... in the event the individual is diagnosed and certified as having a terminal and irreversible condition.
[3] See Ciko v. City of New Orleans, 427 So.2d at 82.