COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Elder,
          Annunziata, Bumgardner, Frank, Humphreys, Clements,
          Agee, Felton and Kelsey
Argued at Richmond, Virginia


BENJAMIN WAYNE McCRACKEN
                                              OPINION BY
v.   Record No. 2912-00-3       JUDGE RUDOLPH BUMGARDNER, III
                                          NOVEMBER 26, 2002
COMMONWEALTH OF VIRGINIA


                  UPON A REHEARING EN BANC

          FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
                  Nicholas E. Persin, Judge

          John B. Coleman (Scyphers & Austin, P.C., on
          brief), for appellant.

          Virginia B. Theisen, Assistant Attorney
          General (Jerry W. Kilgore, Attorney General,
          on brief), for appellee.


     A jury convicted Benjamin Wayne McCracken of possession of

marijuana and two counts of assault and battery of a law

enforcement officer.  He contends the trial court erroneously

admitted evidence obtained when a deputy sheriff illegally

entered a home, frisked the defendant, and found marijuana in

his pocket.  He maintains he lawfully used reasonable force to

resist his arrest because it was unlawful.

     A panel of this court held that the trial court erred in

admitting unlawfully seized marijuana and reversed the

conviction of possession of marijuana.  The panel held the

defendant was not entitled to resist his arrest and affirmed the two convictions for assault and battery of a law enforcement officer. We granted a petition for rehearing en banc and stayed the mandate of the panel decision. Upon rehearing en banc, we affirm the trial court.

On appeal of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them," McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc), but we review de novo the trial court's application of legal standards such as reasonable suspicion to the particular facts of the case. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

The defendant and Teresa Fields had lived together for almost three years in a house owned by Fields. During an argument, Fields called the 911 emergency dispatcher to have the defendant removed from her residence. When Deputies Dollar and Sexton responded to the "domestic disturbance" the couple were still arguing, but the situation had not escalated to violence. The defendant agreed to move out of Fields' house, and the deputies remained for forty-five minutes and helped him remove his belongings. The defendant went to stay with his mother.

After the defendant arrived there, he telephoned Fields, and the two renewed their argument. When that call ended, the defendant's mother telephoned Fields and warned her that the defendant was going to her house. Fields called the 911 emergency dispatcher a second time and reported the defendant was returning. The dispatcher instructed her to lock her doors and dispatched Deputies Dollar and Sexton to the "domestic call."

When Deputy Dollar arrived at Fields' house, the back door was locked, neighbors were in the front yard screaming, and the deputy heard Fields and the defendant arguing inside the house. The front door was partially open, but the screen door was closed. The deputy drew his weapon, pushed open the screen door, and entered.

The defendant and Fields were standing four to six feet apart. The deputy saw nothing in their hands. He holstered his weapon, but as he looked over the defendant, he noticed a bulge in his right front pants pocket. He asked the defendant to place his hands on the wall so he could make sure the defendant did not have any weapons. The defendant did not comply and kept moving around the room despite repeated requests to put his hands on the wall. Finally, the defendant stopped and put his hands on the back of a love seat.

While the defendant leaned against the love seat, the deputy patted the defendant's front right pocket and felt a

hard, rigid object in it.  The deputy reached into the pocket
for the hard object, but first uncovered a plastic baggie
containing plant matter, which had been on top of the hard
object.  The deputy believed the bag contained marijuana.  He
told the defendant he was under arrest for possession of it and
instructed the defendant to put his hands behind his back.
Again the defendant disregarded instructions.  He "kept easing
away," and then stated he wanted his Skoal and his gun.  The
defendant started toward the kitchen at a fast pace.

Deputy Dollar told the defendant to stop and grabbed hold
of him.  The defendant resisted; the two began to scuffle, and
then to fight.  During the altercation the defendant kicked the
deputy, struck him in the face, and began choking him with a
headlock hold.  At that point, Deputy Sexton arrived.  While he
tried to break the defendant's hold on Dollar, the defendant
elbowed Sexton in the ribs.  Eventually, the two deputies
subdued the defendant and handcuffed him.[1]

Before opening the screen door, the deputy had probable
cause to believe the defendant was trespassing, Code § 18.2-119.[2]

---

[1] Later searches revealed a rifle behind the bedroom door,
five feet from the site of the struggle, and a folding knife in
the defendant's right front pants pocket.

[2] Code § 18.2-119 provides:

> If any person without authority of law goes
> upon or remains upon the lands, buildings or
> premises of another . . . after having been
> forbidden to do so, either orally or in

The deputies responded to the initial domestic disturbance call because Teresa Fields wanted the defendant removed from her house. Fields was the owner of the residence, and she could properly revoke the defendant's permission to be on the property. He left voluntarily the first time, but ninety minutes later he returned to her house causing Fields to place a second call to the 911 emergency dispatcher. When the deputy responded, neighbors were screaming, and the deputy heard the defendant inside arguing with Fields. "In determining whether probable cause exists courts will test what the totality of the circumstances meant to police officers trained in analyzing the observed conduct for purposes of crime control." Hollis v. Commonwealth, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976).

As a trespasser, defendant had no justifiable expectation of privacy in Fields' home and therefore no standing to contest the entry of the house. See Woodson v. Commonwealth, 25 Va. App. 621, 626, 491 S.E.2d 743, 745 (1997) ("We hold that appellant was not lawfully on the premises and that, as a trespasser, he lacks the privacy interest necessary to claim a Fourth Amendment violation.").[3]

---

writing, by the owner, lessee, custodian or other person lawfully in charge thereof . . . he shall be guilty of a Class 1 misdemeanor.

[3] The deputy was answering a complaint, a call for assistance from the homeowner, and he was entering the property of the complainant, not of the defendant. The deputy was not

The deputy entered armed with probable cause to believe the defendant was trespassing. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). When an officer has probable cause to arrest, he may conduct a search prior to the arrest. Cardwell v. Lewis, 417 U.S. 583, 595 (1974).

The argument between Fields and the defendant could easily have escalated if the deputy had not acted immediately upon noticing the bulge in the defendant's pocket. Domestic disturbances have a low flash point, and "violence may be lurking and explode with little warning." Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999).[4]

---

making a warrantless arrest of the defendant in his home as in Payton v. New York, 445 U.S. 573, 574 (1980). Nor was the homeowner prosecuted with evidence seized in the home while executing an arrest warrant for someone else as in Steagald v. United States, 451 U.S. 204, 205 (1981).

[4] In recognition of the difficulty of protecting against domestic violence, the General Assembly increased the duties of law-enforcement officers when responding to such incidents. See Code § 19.2-81.3. Police are entitled to arrest without a warrant though the violation does not occur in their presence. They must arrest "the primary physical aggressor" if they develop probable cause unless special circumstances exist. The police must make a written report of any incident in which they have probable cause that "family abuse" occurred and written explanation of the special circumstances if they do not arrest. Finally, if the officer has probable cause to believe that a danger of acts of family abuse exists, he "shall seek an emergency protective order . . . ." "Family abuse" not only includes violence and force resulting in bodily injury, but it

After initially resisting, the defendant placed his hands on the love seat and permitted the officer to pat down the defendant's pants pocket. At that point, the deputy was lawfully taking "such steps as [were] reasonably necessary to protect [his and others'] personal safety . . . ." United States v. Hensley, 469 U.S. 221, 235 (1985). The marijuana found in the course of that lawful search was properly admitted in evidence.

While a person is entitled to use reasonable force to resist an unlawful arrest, he is not entitled to resist a lawful arrest. Brown v. Commonwealth, 27 Va. App. 111, 116-17, 497 S.E.2d 527, 529-30 (1998). The deputies arrested on probable cause to believe the defendant was trespassing and possessed marijuana, thus the defendant had no right to resist this lawful arrest.

A lawful arrest, when made with unlawful force, may be resisted. Palmer v. Commonwealth, 143 Va. 592, 602-03, 130 S.E. 398, 401 (1925); Foote v. Commonwealth, 11 Va. App. 61, 66, 396 S.E.2d 851, 856 (1990). "[A]n arrest utilizing excessive force is a battery because that touching is not justified or excused and therefore is unlawful." Gnadt v. Commonwealth, 27 Va. App. 148, 151, 497 S.E.2d 887, 888 (1998). The officers in this case

---

also includes a threat that places one in reasonable apprehension of bodily injury. See Code § 16.1-228.

used reasonable force to subdue the defendant when he refused to submit. The deputies did not use excessive force by ratcheting the force employed when nothing less brought the defendant under control. The defendant was not entitled to resist his lawful arrest made with lawful force.

We conclude the conduct of the deputy sheriffs in responding to this series of events was reasonable under the totality of the circumstances. Accordingly, we affirm.

<u>Affirmed.</u>

Benton, J., dissenting.

                                    I.

    The evidence proved that Benjamin McCracken and Teresa Fields lived together in the house for nearly three years. Fields testified that on April 8, 2000, McCracken was asleep when she began cleaning the house. After the cleaning noise awakened McCracken, Fields and McCracken argued. Fields testified that she "had an excruciating headache, . . . was ill, irritable." When she became tired of arguing, she called the police dispatcher, who sent two officers to the residence at midday in response to Fields' telephone call. One of the officers testified that they responded to a complaint of "verbal arguing." No evidence indicates Fields told the dispatcher or the officers she wanted the officers to remove McCracken from the house.

    When the police arrived, McCracken was putting various personal possessions in his car. Fields and McCracken explained that "they'd had [a] verbal argument and that [there] had been no assault." When asked if he was able to calm the situation, the officer responded, "It seemed to have been not very escalated." The officers remained while McCracken gathered some of his personal possessions and put them in his car. One officer described the situation as "very peaceful" and said they helped McCracken load some of his possessions. The other officer testified that McCracken was "very friendly, [that

McCracken] agreed to leave, and [that] there were no problems whatsoever."  Fields testified that she and McCracken declined "to fill out any type of papers to keep each other away" and said "there was no purpose for that."

McCracken went to his mother's residence with some of his personal possessions and later telephoned Fields.  During that conversation, McCracken and Fields were both agitated.  McCracken's mother later telephoned Fields to inform her that McCracken was returning to collect more of his personal possessions.  Before McCracken arrived at the residence, Fields telephoned the police dispatcher and requested that the officers return to her home.  Fields testified that she "overreacted" and telephoned for the officers to return because she had to go to work.  She expected to be late arriving at work and did not want to be further delayed by an argument with McCracken.  She testified that when McCracken arrived he told her "he was there to pick up some of his belongings."

The officers returned to the residence about an hour and a half after they had left the residence.  The first officer to arrive testified that before entering the residence, he heard neighbors hollering something to him.  Fields' sister testified that, when she saw the officer having difficulty opening the screen door, she called to him that "the front door drags."  The officer testified that he heard Fields and McCracken "verbally arguing back and forth when he walked up on the porch."  Fields

testified, however, that she was talking to McCracken and that they were not arguing. The officer drew his weapon and walked into the house without knocking.

## II.

McCracken contends the officers had neither probable cause to believe a crime was being committed nor exigent circumstances to justify their entry. The Commonwealth responds the "officers had probable cause at the time of their warrantless entry to believe that cognizable exigent circumstances were present" because of a "domestic" dispute.

The United States Supreme Court has held that, "absent probable cause and exigent circumstances, warrantless [entries and] arrests in the home are prohibited by the Fourth Amendment." Welsh v. Wisconsin, 466 U.S. 740, 741 (1984); Payton v. New York, 445 U.S. 573, 590 (1980). "[W]arrantless entries into dwellings, followed by searches, seizures, and arrests therein . . . are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances." Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752-53 (1985); Welsh, 446 U.S. at 750. Furthermore, "[e]xigent circumstances justify a warrantless entry . . . only when the police have probable cause to obtain a search warrant." Alexander v. Commonwealth, 19 Va. App. 671, 674, 454 S.E.2d 39, 41 (1995).

The trial judge found that the officers acted reasonably in entering the residence and denied the motion to suppress. His findings included the following:

> There is no question or at least I haven't heard any evidence that would cause the Court to believe that the first call was not made by her complaining about the conduct of [McCracken]. The officers responded. When they got there, evidently a reasonable inference would be that . . . Fields and [McCracken] had come to some sort of agreement. The officers testified that there was no fighting or arguing, that he was in the process of removing his property. He was cooperative, he was loading his vehicle, his personal items, some of his stereo equipment. The officers even assisted him. So there is no evidence of any ill feeling or ill will from the first call. But the fact remains that . . . Fields called for help the first time. . . . Shortly thereafter, an hour or hour and a half later, a second call comes in. And the evidence is unrebutted that [McCracken] is back on her property where he was living with her. And the Jury has heard evidence that there was screaming on the outside, one of the officers heard it, the other one didn't. Officer Sexton says he didn't. And when they go inside of the house, the Court is of the opinion that that was reasonable. I mean, here you had a second call where the officers thought [McCracken] was leaving and was cooperative and left. Now he's back on the scene. And the owner of the property is calling the officers again for assistance. They respond. They come in, they observe, they know there's been prior problems.

We have held that a call to the police dispatcher for assistance does not, without more, give rise to probable cause to believe a crime is occurring. Id. at 674-75, 454 S.E.2d at 41. The evidence proved that when the police arrived in

response to the first call from Fields, McCracken had made no threats. Indeed, Fields had not even expressed fear of McCracken when she first called the police dispatcher. She testified that when the dispatcher specifically "asked [her] if [McCracken] was hitting [her] or being physical," she "told him no, that it was just verbal." Although McCracken and Fields had had an argument, the officers testified that matters were peaceful and non-threatening.

The evidence also proved that when Fields called the police on the second occasion, McCracken had not arrived. Fields knew the police dispatcher and told him "that [her problem with McCracken] was just verbal." She testified that she reported no crime, that she expected no trouble from McCracken, and that she wanted the officers there because she had to go to work and did not want to be delayed by an argument with McCracken. Thus, she had not given the police dispatcher or the officers any basis to believe McCracken would do anything other than continue to gather his property. "Probable cause for police officers to enter a person's [residence] must be based on more than speculation, suspicion, or surmise that a crime might be in progress." Id. at 674, 454 S.E.2d at 41. The officers could not reasonably infer from either their first visit to the house or the call to return to the house that when McCracken returned to remove more of his property he either posed any threat to Fields or would commit a crime. Simply put, this evidence

failed to prove the officer had probable cause to believe a crime had been or was being committed when he made the warrantless entry into the home.

Although the majority contends that McCracken had committed a trespass and had no expectation of privacy in the residence, no evidence supports that hypothesis. The Commonwealth never suggested at trial that McCracken committed a trespass or lacked standing. Moreover, the trial judge made no finding that McCracken committed a trespass or lacked standing. Indeed, prior to this hearing en banc, the Commonwealth never argued trespass or the lack of standing. I substantially agree, therefore, with the discussion in Part I(A) of Judge Elder's concurring and dissenting opinion that we have no basis to consider, in the first instance, these issues on appeal.

In addition, the evidence proved that when the prosecutor asked Fields, "who actually owns the home where this incident took place?," Fields responded, "My father. He give it to me and my [minor] daughter." Although the evidence did not indicate whether Fields and McCracken paid rent to Fields' father, the evidence also did not prove McCracken had been barred by anyone from entering the house. Significantly, Fields did not testify that she had barred McCracken from returning to the house. Instead, she testified she told the dispatcher, whom she knew, that McCracken had never physically abused her, and she further testified she wanted the police there solely to

prevent another argument which would delay her departure to work. Indeed, when McCracken initially left with some of his possessions, Fields told the officers it was not necessary for her "to fill out any type of papers to keep each other away from each other." The trial judge specifically found that Fields and McCracken "had come to some sort of agreement" before the officers initially arrived and before McCracken went to his mother's residence. Thus, the evidence proved that when McCracken returned to the house in which he had lived for three years, he had not been barred from the premises, and he used his key to enter the house to gather his possessions. The assertions of trespass and lack of standing at this stage of the proceedings are an after the fact rationale unfounded by the evidence.

The principle is well established that "no amount of probable cause can justify a warrantless [entry into a home] . . . absent 'exigent circumstances.'" Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971); Payton, 445 U.S. at 590. "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh, 466 U.S. at 750. The evidence proved that McCracken had never physically abused Fields and that she had no fear of him. Moreover, Fields did not tell the police dispatcher McCracken had threatened her.

She testified she has known the dispatcher "for years" and told the dispatcher her only concern was the arguments.  She merely wanted someone there to prevent another argument.  Although the trial judge could believe the officer's testimony that he heard argument and disbelieve Fields' testimony that she and McCracken were not arguing, the mere occurrence of an argument is not indicative of a threat to life or serious injury.  The officer had no other basis to believe an emergency existed.  Indeed, the officers earlier had witnessed McCracken's conduct at the home and testified that the situation was "peaceful."

As in Shannon v. Commonwealth, 18 Va. App. 31, 34, 441 S.E.2d 225, 226, aff'd on reh'g en banc, 19 Va. App. 145, 449 S.E.2d 584 (1994), and Alexander, this evidence contains no basis upon which the police officers could have concluded that an emergency existed.  Thus, the Commonwealth failed to meet its "heavy burden" of proving exigent circumstances existed justifying the warrantless entry.  Alexander, 19 Va. App. at 674, 454 S.E.2d at 41.

III.

"At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion."  Silverman v. United States, 365 U.S. 505, 511 (1961).  "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"

<u>Welsh</u>, 466 U.S. at 748 (citation omitted).  "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house."  <u>Payton</u>, 445 U.S. at 590.  Thus, the Supreme Court has reiterated that it "held in <u>Payton</u> . . . that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him."  <u>Minnesota v. Olson</u>, 495 U.S. 91, 95 (1990).

Unlike in <u>United States v. Moore</u>, 483 F.2d 1361, 1364 (9th Cir. 1973), where "[t]he warrantless arrest was . . . lawful, in itself," <u>id.</u> at 1364, here it was not.  The officer's warrantless entry to McCracken's residence presumptively was constitutionally unlawful, <u>Payton</u>, 445 U.S. at 586, and could not support an arrest even upon probable cause.  <u>See</u> <u>Olson</u> and <u>Payton</u>.  <u>See also</u> <u>Horton v. California</u>, 496 U.S. 128, 137 n.7 (1990).  The principle is well established and long standing that an unlawful, warrantless entry by a police officer into a residence renders void the power to arrest even if probable cause arises upon a discovery inside the residence after the unlawful entry.  <u>Johnson v. United States</u>, 333 U.S. 10, 15-17 (1948); <u>Welsh</u>, 466 U.S. at 748-50; <u>Payton</u>, 445 U.S. at 588-90.  <u>See also</u> <u>Jefferson v. Commonwealth</u>, 27 Va. App. 1, 18, 497 S.E.2d 474, 482-83 (1998) (holding that the "arrest of appellant . . . executed after the officer entered the curtilage of appellant's home without a warrant . . . violated the Fourth

Amendment").  The purpose of these decisions, holding the arrests to be void, is "to protect [the] home from entry." Olson, 495 U.S. at 95.

> An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine "the right of the people to be secure in their persons, houses, papers, and effects," and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.

Johnson, 333 U.S. at 17 (footnote omitted).

"It has long been held in Virginia that where an officer attempts an unlawful arrest, the officer is an aggressor which gives the arrestee the right to use self-defense to resist so long as the force used is reasonable."  Brown v. Commonwealth, 27 Va. App. 111, 116-17, 497 S.E.2d 527, 530 (1998).  This principle of law treats the unlawful arrest as an unauthorized touching and, thus, a battery against the attempted arrestee. The Supreme Court, therefore, has held that where an officer attempts an unlawful arrest, the arrestee "could resist with such reasonable force as was necessary to repel that being exercised by the officer in that undertaking."  Broaddus v. Standard Drug Co., 211 Va. 645, 652, 179 S.E.2d 497, 503 (1971). Thus, for example, in further contrast to Moore, where the Ninth Circuit indicated an arrestee may only resist unlawful arrests that are the result of "bad faith, unreasonable force, or

provocative conduct on the part of the arresting officer,"
Moore, 483 F.2d at 1365, Virginia decisions hold that even if a
police officer acts in "good faith" an arrestee may still resist
an unlawful arrest.  Brown, 27 Va. App. at 118, 497 S.E.2d at
530.

The evidence proved that McCracken initially resisted being
searched and then attempted to maneuver his way around the
officer after the officer sought to arrest him.  Because the
attempt to search and arrest McCracken was made after the
officer had unlawfully entered the home without a warrant,
McCracken had a right to use reasonable force to resist any of
the officer's conduct.  The encounter escalated to a physical
altercation only when the officer jumped onto McCracken's back.

The events that gave rise to the search and arrest all
occurred within the home, after the officers had unlawfully
entered the home and upon the officer's discovery of evidence
within the home during that unlawful entry.  This is precisely
the circumstance the Supreme Court's decision in Payton barred
by holding that "'physical entry of the home is the chief evil
against which the wording of the Fourth Amendment is directed.'"
445 U.S. at 585 (citation omitted).  The rule in Payton was
derived from the "overriding respect for the sanctity of the
home that has been embedded in our traditions since the origins
of the Republic."  Id. at 601.  By drawing a line at the
entrance to a home, the Fourth Amendment protects the physical

integrity of the home.  As the Court noted in Johnson, "officers

. . . thrust[ing] themselves into a home is . . . a grave

concern not only to the individual but to a society which

chooses to dwell in reasonable security and freedom from

surveillance."  333 U.S. at 14.  Based on the unlawful entry,

McCracken was not unreasonable in his attempt to resist the

unlawful arrest and did not use excessive force in resisting.

IV.

For these reasons, I would hold that the officer's

warrantless entry into the residence violated the Fourth

Amendment.  The officer's unlawful entry negated his authority

to search McCracken and make an arrest for events occurring

inside the home.[5]  Therefore, I would reverse all the convictions

and dismiss the indictments.  See Alexander, 19 Va. App. at 675,

454 S.E.2d at 41.

---

[5] Although I would hold that the officer's warrantless entry
was presumptively unlawful and negated his power to arrest, I
agree with the portion of Part I(B) of Judge Elder's concurring
and dissenting opinion which indicates that the circumstances
did not provide the officer with a reasonable, articulable
suspicion that McCracken was armed and dangerous.  "An officer
may not, simply by observing some item causing a 'bulge' in
one's clothing, conduct a general frisk where the nature of the
bulge or the surrounding circumstances do not reasonably support
the conclusion that . . . the person is armed and dangerous."
Stanley v. Commonwealth, 16 Va. App. 873, 877, 433 S.E.2d 512,
515 (1993).  As we noted in Stanley, these facts would
impermissibly sanction an officer "in patting down anyone who
happened to be carrying a checkbook or wallet in his pants
pocket."  16 Va. App. at 877, 433 S.E.2d at 515.

Elder, J., concurring, in part, in the judgment and dissenting, in part.

For the reasons that follow, I concur in the majority's affirmance of appellant's two convictions for assault and battery on a law enforcement officer but dissent from its affirmance of his conviction for marijuana possession.  I substantially concur in the majority's recitation of the relevant facts.

I.

A.

TRESPASS

The majority concludes the search of appellant was valid as incident to arrest because Deputy Dollar had probable cause to arrest for trespass before he conducted the search.  I recognize the principle that an appellate court may affirm the judgment of the trial court when it has reached the right result for the wrong reason.  See, e.g., Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992).  However, this principle requires that both "the correct reason and its factual basis were presented at trial."  McLellan v. Commonwealth, 37 Va. App. 144, 155, 554 S.E.2d 699, 704 (2001).  Because the existence of probable cause to arrest for trespass or any other crime was not raised at trial as a basis for justifying Deputy Dollar's search of appellant and because no challenge was made to appellant's standing to contest Deputy Dollar's entry, I would hold that

neither of these grounds may serve as the basis for this Court's affirmance of appellant's convictions.

In the trial court, the Commonwealth argued that the deputy had a right

> to do a frisk search . . . to protect himself because . . . he didn't know what he was looking at coming in on that second call. And once he found an object in the pocket, he had the right to take that object out and that turned out to be the marijuana. It's a valid frisk, it's a valid arrest . . . .

Appellant argued the police lacked probable cause to enter and also lacked the articulable suspicion necessary to justify a weapons frisk. The trial court ruled that, based on the events occurring during the deputies' first and second trips to the residence, they had the right to "do[] a pat down to ensure their own safety." The court expressly found that Teresa Fields was the owner of the house, a subsidiary factual finding relevant to the issue of whether a trespass occurred. However, neither party mentioned whether appellant was a trespasser or had standing to contest Deputy Dollar's entry of the residence, and the trial court gave no indication that it considered these issues or made any of the additional factual findings critical to their resolution.

Thus, I would hold that neither the existence of probable cause to arrest appellant for trespassing nor his alleged lack of standing to contest Deputy Dollar's entry of the residence,

provides a valid basis for affirming appellant's convictions and would consider only the arguments advanced in the trial court. Based on these arguments, for the reasons that follow, I would reverse appellant's conviction for marijuana possession and affirm his convictions for assault and battery on a law enforcement officer.

B.

WEAPONS FRISK

In order for an officer to conduct a weapons frisk, two conditions must exist. First, the officer must rightly be in the presence of the party frisked so as to be endangered if the person is armed. See, e.g., 4 Wayne R. LaFave, Search and Seizure § 9.5, at 246 (3d ed. 1996). Second, the officer must be able to point to "'specific and articulable facts'" "which reasonably lead[] him to conclude, in light of his experience, . . . that the suspect 'may be armed and presently dangerous.'" Lansdown v. Commonwealth, 226 Va. 204, 209, 308 S.E.2d 106, 110 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21, 30, 88 S. Ct. 1868, 1880, 1884, 20 L. Ed. 2d 889 (1968)).

In assessing whether a particular person may be armed and dangerous, an officer may consider "characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." Christian

v. Commonwealth, 33 Va. App. 704, 714, 536 S.E.2d 477, 482 (2000) (en banc) (footnote omitted). "An officer may not, simply by observing some item causing a 'bulge' in one's clothing, conduct a general frisk where the nature of the bulge or the surrounding circumstances do not reasonably support the conclusion that . . . the person is armed and dangerous." Stanley v. Commonwealth, 16 Va. App. 873, 877, 433 S.E.2d 512, 515 (1993); see also United States v. Wilson, 953 F.2d 116, 125 (4th Cir. 1991) (holding that, absent additional evidence, seeing "a bulge [in clothing of person at airport] is not the sort of observation that has any significance"). Compare Stanley, 16 Va. App. at 876, 433 S.E.2d at 514 (holding the Fourth Amendment "does not legitimize a patdown search of someone stopped for a routine traffic offense simply because he is carrying an item the size and configuration of a wallet or checkbook in his front pants pocket"), with Troncoso v. Commonwealth, 12 Va. App. 942, 945, 407 S.E.2d 349, 350-51 (1991) (holding that if bulge observed in stomach area of driver during routine traffic stop is accompanied by fidgeting, nervousness, and effort to conceal bulge, officer's belief that subject may be armed and dangerous is reasonable).

Here, Deputy Dollar responded to Fields' second 911 call and entered her residence through an unlocked door only after he encountered neighbors in the front yard yelling and heard arguing inside the residence. Thus, Deputy Dollar was rightly

in appellant's presence.  Nevertheless, the evidence did not provide Deputy Dollar with reasonable, articulable suspicion to conclude that the object in appellant's pocket may have been a weapon.  Although Deputy Dollar was responding to a 911 "domestic call" at Fields' residence for the second time that day, the first call involved only "verbal arguing," was "not very escalated," and resolved peacefully with no indication that either party possessed a weapon or was predisposed to use violence toward the other or toward the deputies.  When Deputy Dollar returned the second time, neighbors were in the front yard yelling, and Dollar heard the parties inside "verbally arguing back and forth" while he stood on the front porch, but Dollar did not testify that he overheard either party threaten the other or that he heard anything indicating physical violence or abuse.

When Dollar entered unannounced, he immediately saw Fields and appellant standing at least four feet apart, he noticed nothing unusual about Fields' appearance, and he saw nothing in either party's hands.  Although he noticed appellant's right front pocket was "bulging" and concluded that appellant had "something" inside his pocket, Dollar articulated no specific basis for believing that "something" might be a weapon.  Before Deputy Dollar attempted to frisk appellant for weapons, appellant engaged in no additional behavior and made no

statements tending to indicate that he was armed and presently posed a danger to Fields or Deputy Dollar.

Thus, I would conclude Deputy Dollar lacked reasonable articulable suspicion to believe appellant was both armed and presently dangerous when Dollar told appellant he intended to frisk appellant for weapons. I recognize that domestic disputes often are fraught with danger for both their participants and the law enforcement officers trying to diffuse them. See, e.g., Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999) (noting that in domestic disputes, "violence may be lurking and explode with little warning"). Nevertheless, I am unwilling to hold that an officer responding to a verbal domestic dispute may frisk a party to the dispute solely because that party has an unidentified "bulge" in his pocket. Accordingly, I would hold that Deputy Dollar's frisk of appellant and search of his pocket were unreasonable and that the fruits of that search should have been suppressed. Because no evidence other than the illegally seized marijuana supported appellant's conviction for marijuana possession, I would reverse that conviction and dismiss the underlying charge.

C.

ASSAULT AND BATTERY ON A LAW ENFORCEMENT OFFICER

"An unlawful arrest or an arrest utilizing excessive force is a battery because that touching is not justified or excused and therefore is unlawful." Gnadt v. Commonwealth, 27 Va. App.

148, 151, 497 S.E.2d 887, 888 (1998). In either case, the arrestee may use reasonable force to resist the arrest. See Palmer v. Commonwealth, 143 Va. 592, 602-03, 130 S.E. 398, 401 (1925); Foote v. Commonwealth, 11 Va. App. 61, 69, 396 S.E.2d 851, 856 (1990). Here, I would hold appellant was not entitled to use reasonable force to resist his arrest because the arrest was not unlawful in the sense required to permit him to resist the arrest, and I concur in the majority's conclusion that the officers used no more force than was necessary to effect the arrest.

"In Virginia, . . . [t]he lawfulness of an attempted arrest [for purposes of assessing an arrestee's right to resist the arrest] is determined by [Code §§ 19.2-77, 19.2-81, and 19.2-100]." Brown v. Commonwealth, 27 Va. App. 111, 116, 497 S.E.2d 527, 530 (1998); see also Johnson v. United States, 333 U.S. 10, 15 & n.5, 68 S. Ct. 367, 370 & n.5, 92 L. Ed. 436, 441 & n.5 (1948) (in reviewing reasonableness of search claimed constitutional as incident to arrest, holding state law "determine[s] whether the arrest itself was lawful"). Code § 19.2-81, the statute applicable here, provides in pertinent part that a sheriff's deputy "may arrest, without a warrant, any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence." Thus, "[t]he dispositive question is whether the officers had

probable cause to arrest . . . ." Smith v. Commonwealth, 30 Va. App. 737, 740, 519 S.E.2d 831, 832 (1999).

No Virginia appellate decision holds that an arrest is unlawful for purposes of entitling the arrestee to resist the arrest simply because the evidence which provides probable cause for the arrest is obtained in a search or seizure that is unreasonable under the Fourth Amendment. Cf. Commonwealth v. Hill, 264 Va. ___, ___, 570 S.E.2d 805, ___ (Nov. 1, 2002) (in holding no right exists to resist an unlawful detention without revisiting the continuing validity of the right to resist an unlawful arrest, noting that "'"[c]lose questions as to whether an officer possesses articulable suspicion must be resolved in the courtroom and not fought out on the streets"'" (quoting State v. Wiegmann, 714 A.2d 841, 849-50 (Md. 1998) (quoting State v. Blackman, 617 A.2d 619, 630 (Md. Ct. Spec. App. 1992)))). Further, the Ninth Circuit Court of Appeals has held that an arrest flowing from an unreasonable search which yields marijuana is not "unlawful" in the sense required to permit the arrestee to resist. United States v. Moore, 483 F.2d 1361, 1364-65 (9th Cir. 1973). As that court explained,

> [t]he privilege [to resist] is available only if the arrest was "unlawful." The parties agree that appellant was arrested after the agents discovered the marihuana in his suitcase [while conducting an unreasonable search]. The agents then had probable cause to believe that a felony was being committed in their presence. The warrantless arrest was therefore lawful, in

itself.  It was "unlawful" only in the
exclusionary-rule sense that it was "fruit"
of the prior unlawful search.  We have been
cited no authority, and have found none,
that permits resistance to an arrest that is
<u>unlawful only in this derivative sense</u>.

<u>Id.</u> (emphasis added).

The court in <u>Moore</u> examined "[t]he purposes of the privilege [to resist an unlawful arrest]," which it cited as "deter[ring] abuses of police authority" and "preserv[ing] the sense of personal liberty and integrity . . . by protecting from punishment persons who reasonably resist unlawful intrusions by government agents."  <u>Id.</u> at 1365.  It concluded that "the resolution of often difficult issues relating to the lawfulness of the search [upon which the challenged arrest was based] are surely best left to subsequent court proceedings."  <u>Id.</u>; <u>see also</u> <u>Hill</u>, 264 Va. at ___, 570 S.E.2d at ___.  As a result, the court was "unwilling," under the facts of that case, "to initiate . . . an extension of the privilege [to resist]" an arrest that was unlawful only in a "derivative sense."[6]  <u>Moore</u>, 483 F.2d at 1365.

---

[6] The court indicated in <u>Moore</u> that it might be willing to extend the right to resist an arrest supported by probable cause if the arrestee "claim[ed] . . . bad faith, unreasonable force, or provocative conduct on the part of the arresting officer." 473 F.2d at 1365; <u>see also</u> <u>United States v. Span</u>, 970 F.2d 573, 579-80 (9th Cir. 1992).
Assuming that whether the officer acted in bad faith would be relevant under Virginia law, <u>see</u> <u>Brown</u>, 27 Va. App. at 116, 497 S.E.2d at 530 (holding that where officer makes arrest without valid warrant or probable cause, arrest is unlawful and whether officer acted in good faith is irrelevant to arrestee's

Similarly, in appellant's case, the arrest was unlawful only in a "derivative sense."  Id.  Assuming the entry and the weapons frisk violated the Fourth Amendment's prohibition against unreasonable searches and seizures, the evidence establishes that "appellant was arrested after [Deputy Dollar] discovered the mari[j]uana in his [pocket].  [Deputy Dollar] then had probable cause to believe that a [crime] was being committed in [his] presence.  The warrantless arrest was therefore lawful, in itself," even if unlawful in a "derivative sense."  Id. at 1364-65; see Code § 19.2-81.  Assuming without deciding that appellant would have been privileged to use reasonable force to resist the entry or the weapons frisk or both, but see Hill, 264 Va. at ___, 570 S.E.2d at ___, appellant lost the privilege to resist his subsequent arrest once Deputy Dollar discovered marijuana in his possession, even if Dollar's

---

right to resist that unlawful arrest); Foote, 11 Va. App. at 67, 396 S.E.2d at 855 (holding that where officer makes arrest based on radio transmission regarding existence of charges against particular person in another jurisdiction but does not obtain name or reasonably accurate description of person to confirm arrestee is the person wanted, arrest is unlawful and whether officer acted in good faith is irrelevant to arrestee's right to resist that unlawful arrest), no evidence established that Deputy Dollar acted in bad faith.  As counsel for appellant conceded in argument, "I don't need to come in here to Court and say, bad cop, bad cop, [I] don't believe that.  The simple fact is these two officers have nine months of experience between them. . . .  I think what happened was, adrenalin[e] took over, . . . and the Fourth Amendment went out the window."
    Further, as discussed in the majority opinion, Virginia law recognizes a right to resist an arrest involving excessive force, and this right did not apply under the facts of this case.

discovery of the marijuana resulted from an unreasonable entry and search.

II.

In sum, I would hold that, although Deputy Dollar was rightly in appellant's presence, the weapons frisk violated the Fourth Amendment because the presence of a bulge in appellant's pocket was insufficient under the facts of this case to provide reasonable suspicion that appellant was armed and dangerous. However, I would also hold that appellant had no right to resist his arrest for possession of marijuana. Thus, I concur in the majority's affirmance of appellant's two convictions for assault and battery of a law enforcement officer but dissent from its affirmance of the conviction for marijuana possession.

Wednesday      12th

June, 2002.


Benjamin Wayne McCracken,                          Appellant,

 against       Record No. 2912-00-3
               Circuit Court Nos. CR00-259, CR00-260 and
                         CR00-262

Commonwealth of Virginia,                          Appellee.


Upon a Petition for Rehearing En Banc

Before the Full Court


On May 28, 2002 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on May 14, 2002, and grant a rehearing en banc thereof.

On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on May 14, 2002 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an addendum to the opening brief upon rehearing en banc a copy of the opinion previously rendered by the Court in this matter. It is further ordered that the


appellant shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.


A Copy,

Teste:

       Cynthia L. McCoy, Clerk

By:

      Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Elder and Bumgardner
Argued at Salem, Virginia


BENJAMIN WAYNE McCRACKEN

MEMORANDUM OPINION[*] BY

v. Record No. 2912-00-3     JUDGE LARRY G. ELDER
                                 MAY 14, 2002

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Nicholas E. Persin, Judge

John B. Coleman (Scyphers & Austin, P.C., on
brief), for appellant.

Virginia B. Theisen, Assistant Attorney
General (Randolph A. Beales, Attorney
General, on brief), for appellee.


Benjamin Wayne McCracken (appellant) appeals from his jury

trial convictions for marijuana possession and two counts of

assault and battery on a law enforcement officer. On appeal, he

contends the trial court erroneously denied his motion to

suppress because the officer's warrantless entry and weapons

frisk violated the Fourth Amendment proscription against

unreasonable searches and seizures. As a result, appellant

argues, his arrest for marijuana possession was unlawful.

Because the arrest was unlawful and because the officers used

excessive force in effecting the arrest, he contends, he was

entitled to use reasonable force to resist.

We hold in Part II.A. that the trial court erred in refusing

to suppress the marijuana discovered in the weapons frisk and to

———————————

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

dismiss the marijuana possession charge.  However, we hold in Part II.B. that appellant was not entitled to resist the warrantless arrest, which was based on probable cause and met the requirements of Code § 19.2-81.  Thus, we reverse and dismiss appellant's conviction for marijuana possession and affirm his two convictions for assault and battery on a law enforcement officer.[7]

## I.

## BACKGROUND

As of April 8, 2000, appellant and Teresa Fields were romantically involved and had resided together in Fields' residence for about two-and-one-half years.  That morning, Fields and appellant had an argument, and around noon, Fields called 911 to have appellant removed from her residence.  Uniformed Sheriff's Deputies Resinol L. Dollar, Jr., and Jason D. Sexton responded to the "[911] domestic disturbance call at Teresa Fields' residence."  Upon their arrival, the deputies heard "verbal arguing."  Appellant was "irritable," but "[t]here was no violent confrontation[]," and Deputy Dollar said the situation "seemed to have been not very escalated."  Appellant "agreed to leave" and go stay with his mother.  The deputies supervised appellant's collection of his belongings, and they told Fields to

---

[7] For the reasons set out in his attached opinion, Judge Benton "substantially concur[s]" in both the reasoning and result of Part II.A., which reverses and dismisses appellant's conviction for marijuana possession.  Judge Bumgardner concurs in the result of Part II.B., which affirms appellant's convictions for assault and battery.  Thus, the marijuana possession conviction is reversed and dismissed by Judges Elder and Benton, with Judge Bumgardner dissenting, and the assault and battery convictions are affirmed by Judges Elder and

call them "if [she] had anymore trouble." After forty-five minutes to an hour, appellant and the deputies departed.

After appellant arrived at his mother's residence, appellant telephoned Fields. During that conversation, appellant and Fields were "still agitated," "upset" and "very angry." Shortly after the conversation ended, appellant's mother called Fields to tell her that appellant was on his way back to Fields' residence. Fields then called 911 a second time and told the dispatcher that appellant was on his way back to her house. The dispatcher told her to "lock [her] doors," and he notified Deputies Dollar and Sexton to return to Fields' residence on a "domestic call."

When Deputy Dollar arrived, he found neighbors in the front yard "screaming" and "hollering," and he also "could hear [Fields and appellant inside the house] verbally arguing back and forth." Knowing that Fields had "called [the 911 dispatcher] for assistance," Deputy Dollar drew his weapon, pointed it at the ground, and entered the residence, without knocking, through the closed screen and partially open "main door."

Upon entering, Dollar saw Fields and appellant standing four to six feet apart. Dollar noticed nothing odd about Fields' condition or appearance. Appellant had nothing in his hands, but Dollar saw a bulge in appellant's right front pants pocket, and he asked appellant to place his hands on the wall so that Dollar could "make sure [appellant] didn't have any weapons." Appellant kept moving away from Dollar but finally put his hands on the back of a love seat.

---

Bumgardner, with Judge Benton dissenting.

While appellant leaned on the love seat, Dollar put one of his hands in the center of appellant's back, holstered his weapon and patted the bulge in appellant's pocket. The bulge was "a hard rigid object." When Dollar attempted to retrieve the object, he instead pulled out a baggie containing 2.1 grams of marijuana which had been on top of the hard object, and he asked appellant what he had found. Appellant "was becoming very agitated" and "jerked away" from Dollar, and Dollar was unable to "retrieve the rigid object out of [appellant's] pocket after that."

Dollar told appellant he was under arrest for marijuana possession, but appellant resisted Dollar's instructions to put his hands behind his back. Appellant "kept easing away" and told Dollar he was "just there to get some more of his belongings," including "his gun." Appellant then "started going from the living room to the kitchen at a real quick pace, going toward the back of the house."

Deputy Dollar told appellant to stop, "[got] ahold of [appellant]" from behind and "[tried] to subdue him." Appellant resisted, despite Dollar's verbal instructions. Dollar then used his baton, striking appellant on the thigh and leg, but appellant "was still fighting and kicking and trying to push off the wall back toward [Dollar]." Deputy Dollar then slipped while still holding onto appellant's waist, and appellant "struck [him] across the face when [Deputy Dollar] fell." Appellant put Dollar "in a sort of choking headlock" which covered Dollar's nose and mouth. Dollar was unable to breathe and "was getting very concerned for [his] safety."

About that time, Deputy Sexton arrived and saw appellant and Deputy Dollar on the floor of the kitchen.  When Sexton attempted to get appellant to release his hold on Deputy Dollar, appellant "threw his left elbow back and struck [Sexton] in the ribs."  Sexton then sprayed appellant with pepper spray in an effort to get appellant to release Deputy Dollar.  Appellant, recognizing Sexton was a law enforcement officer, said, "'That tear gas ain't shit, cop,' and then he returned his attention to Deputy Dollar."

Deputy Dollar managed to grab one of appellant's arms.  While Deputy Sexton held appellant's other arm, appellant kicked the right side of Sexton's face and his right knee.  Appellant was "doing his best to keep Deputy Dollar from [handcuffing] him," but the deputies finally succeeded and transported him to the jail.

A search of Fields' residence revealed a rifle belonging to appellant was behind the door of the bedroom located five feet from the site in the kitchen where the struggle took place.  A search of appellant at the jail revealed a folding knife in his right front pocket, the same pocket in which Deputy Dollar had felt the hard object and from which he had recovered the baggie of marijuana.

## II.

## ANALYSIS

### A.

#### WEAPONS FRISK

Appellant contends that the trial court erroneously denied his motion to suppress the marijuana because both Dollar's second entry of Fields' residence and his frisk of appellant for weapons

were unreasonable.  Assuming, for purposes of analyzing the frisk, that Deputy Dollar's second entry of Fields' residence was reasonable, we nevertheless hold that the frisk violated the Fourth Amendment because Dollar lacked reasonable suspicion to believe appellant was armed and dangerous.

On appeal of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).  "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them," McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc), but we review de novo the trial court's application of legal standards such as reasonable suspicion to the particular facts of the case, see Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996).

In order for an officer to conduct a weapons frisk, two conditions must exist.  First, the officer must rightly be in the presence of the party frisked so as to be endangered if the person is armed.  See, e.g., 4 Wayne R. LaFave, Search and Seizure § 9.5, at 246 (3d ed. 1996).  Second, the officer must be able to point to "'specific and articulable facts'" "which reasonably lead[] him to conclude, in light of his experience, . . . that the suspect 'may be armed and presently dangerous.'" Lansdown v. Commonwealth, 226 Va. 204, 209, 308 S.E.2d 106, 110 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21, 30, 88 S. Ct. 1868, 1880, 1884, 20 L. Ed. 2d 889 (1968)).

In assessing whether a particular person may be armed and dangerous, an officer may consider "characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." Christian v. Commonwealth, 33 Va. App. 704, 714, 536 S.E.2d 477, 482 (2000) (en banc) (footnote omitted). "An officer may not, simply by observing some item causing a 'bulge' in one's clothing, conduct a general frisk where the nature of the bulge or the surrounding circumstances do not reasonably support the conclusion that . . . the person is armed and dangerous." Stanley v. Commonwealth, 16 Va. App. 873, 877, 433 S.E.2d 512, 515 (1993); see also United States v. Wilson, 953 F.2d 116, 125 (4th Cir. 1991) (holding that, absent additional evidence, seeing "a bulge [in clothing of person at airport] is not the sort of observation that has any significance"). Compare Stanley, 16 Va. App. at 876, 433 S.E.2d at 514 (holding the Fourth Amendment "does not legitimize a patdown search of someone stopped for a routine traffic offense simply because he is carrying an item the size and configuration of a wallet or checkbook in his front pants pocket"), with Troncoso v. Commonwealth, 12 Va. App. 942, 945, 407 S.E.2d 349, 350-51 (1991) (holding that if bulge observed in stomach area of driver during routine traffic stop is accompanied by fidgeting, nervousness, and effort to conceal bulge, officer's belief that subject may be armed and dangerous is reasonable).

Here, assuming without deciding that Deputy Dollar was rightly in the presence of appellant when he entered Fields'

residence in response to her second 911 call, the evidence did not provide Deputy Dollar with reasonable, articulable suspicion to conclude that the object in appellant's pocket may have been a weapon. Although Deputy Dollar was responding to a 911 "domestic call" at Fields' residence for the second time that day, the first call involved only "verbal arguing," was "not very escalated," and resolved peacefully with no indication that either party possessed a weapon or was predisposed to use violence toward the other or toward the deputies. When Deputy Dollar returned the second time, neighbors were in the front yard yelling, and Dollar heard the parties inside "verbally arguing back and forth" while he stood on the front porch, but Dollar did not testify that he overheard either party threaten the other or that he heard anything indicating physical violence or abuse.

When Dollar entered unannounced, he immediately saw Fields and appellant standing at least four feet apart, he noticed nothing unusual about Fields' appearance, and he saw nothing in either party's hands. Although he noticed appellant's right front pocket was "bulging" and concluded that appellant had "something" inside his pocket, Dollar articulated no specific basis for believing that "something" might be a weapon. Before Deputy Dollar attempted to frisk appellant for weapons, appellant engaged in no additional behavior and made no statements tending to indicate that he was armed and presently posed a danger to Fields or Deputy Dollar.

Thus, we conclude Deputy Dollar lacked reasonable articulable suspicion to believe appellant was both armed and

presently dangerous when Dollar told appellant he intended to frisk appellant for weapons. We recognize that domestic disputes often are fraught with danger for both their participants and the law enforcement officers trying to diffuse them. See, e.g., Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999) (noting that in domestic disputes, "violence may be lurking and explode with little warning"). Nevertheless, we are unwilling to hold that an officer responding to a verbal domestic dispute may frisk a party to the dispute solely because that party has an unidentified "bulge" in his pocket. Accordingly, we hold that Deputy Dollar's frisk of appellant and search of his pocket were unreasonable and that the fruits of that search should have been suppressed. Because no evidence other than the illegally seized marijuana supported appellant's conviction for marijuana possession, we reverse that conviction and dismiss the underlying charge.

B.

ASSAULT AND BATTERY ON A LAW ENFORCEMENT OFFICER[8]

"An unlawful arrest or an arrest utilizing excessive force is a battery because that touching is not justified or excused

---

[8] Part II.B. represents the opinion only of Judge Elder. Judge Bumgardner concurs only in the resulting affirmance of the assault and battery convictions.

and therefore is unlawful." Gnadt v. Commonwealth, 27 Va. App. 148, 151, 497 S.E.2d 887, 888 (1998). In either case, the arrestee may use reasonable force to resist the arrest. See Palmer v. Commonwealth, 143 Va. 592, 602-03, 130 S.E. 398, 401 (1925); Foote v. Commonwealth, 11 Va. App. 61, 69, 396 S.E.2d 851, 856 (1990). Here, appellant was not entitled to use reasonable force to resist his arrest (1) because the arrest was not unlawful in the sense required to permit him to resist the arrest and (2) because the evidence, viewed in the light most favorable to the Commonwealth, establishes that the officers used no more force than was necessary to effect that arrest.

### 1. Lawfulness of Arrest

"In Virginia, . . . [t]he lawfulness of an attempted arrest [for purposes of assessing an arrestee's right to resist the arrest] is determined by [Code §§ 19.2-77, 19.2-81, and 19.2-100]." Brown v. Commonwealth, 27 Va. App. 111, 116, 497 S.E.2d 527, 530 (1998); see also Johnson v. United States, 333 U.S. 10, 15 & n.5, 68 S. Ct. 367, 370 & n.5, 92 L. Ed. 436, 441 & n.5 (1948) (in reviewing reasonableness of search claimed constitutional as incident to arrest, holding state law "determine[s] whether the arrest itself was lawful"). Code § 19.2-81, the statute applicable here, provides in pertinent part that a sheriff's deputy "may arrest, without a warrant, any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence." Thus, "[t]he dispositive question is whether the officers had probable

cause to arrest . . . ."  Smith v. Commonwealth, 30 Va. App. 737, 740, 519 S.E.2d 831, 832 (1999).

No Virginia appellate decision holds that an arrest is unlawful for purposes of entitling the arrestee to resist the arrest simply because the evidence which provides probable cause for the arrest is obtained in a search or seizure that is unreasonable under the Fourth Amendment.  Cf. Hill v. Commonwealth, 37 Va. App. 1, 553 S.E.2d 529 (2001) (holding detention not based on reasonable suspicion or probable cause was illegal and detainee was entitled to use reasonable force to resist).  Further, the Ninth Circuit Court of Appeals has held that an arrest flowing from an unreasonable search which yields marijuana is not "unlawful" in the sense required to permit the arrestee to resist.  United States v. Moore, 483 F.2d 1361, 1364-65 (9th Cir. 1973).  As that Court explained,

> [t]he privilege [to resist] is available only if the arrest was "unlawful."  The parties agree that appellant was arrested after the agents discovered the marihuana in his suitcase [while conducting an unreasonable search].  The agents then had probable cause to believe that a felony was being committed in their presence.  The warrantless arrest was therefore lawful, in itself.  It was "unlawful" only in the exclusionary-rule sense that it was "fruit" of the prior unlawful search.  We have been cited no authority, and have found none,

                  that permits resistance to an arrest that is
                  <u>unlawful only in this derivative sense</u>.

<u>Id.</u> (emphasis added).

     The Court in <u>Moore</u> examined "[t]he purposes of the privilege
[to resist an unlawful arrest]," which it cited as "deter[ring]
abuses of police authority" and "preserv[ing] the sense of
personal liberty and integrity . . . by protecting from
punishment persons who reasonably resist unlawful intrusions by
government agents."  <u>Id.</u> at 1365.  It concluded that "the
resolution of often difficult issues relating to the lawfulness
of the search [upon which the challenged arrest was based] are
surely best left to subsequent court proceedings."  <u>Id.</u>  As a
result, the Court was "unwilling," under the facts of that case,
"to initiate . . . an extension of the privilege [to resist]" an
arrest that was unlawful only in a "derivative sense."[9]  <u>Id.</u>

     Similarly, in appellant's case, the arrest was unlawful only
in a "derivative sense."  <u>Id.</u>  Assuming the entry and the weapons

_____

     [9] The Court indicated in <u>Moore</u> that it might be willing to
extend the right to resist an arrest supported by probable cause
if the arrestee "claim[ed] . . . bad faith, unreasonable force,
or provocative conduct on the part of the arresting officer."
473 F.2d at 1365; <u>see also</u> <u>United States v. Span</u>, 970 F.2d 573,
579-80 (9th Cir. 1992).
     Assuming that whether the officer acted in bad faith is
relevant under Virginia law, <u>see</u> <u>Brown</u>, 27 Va. App. at 116, 497
S.E.2d at 530; <u>Foote</u>, 11 Va. App. at 67, 396 S.E.2d at 855, no
evidence established that Deputy Dollar acted in bad faith.  As
counsel for appellant conceded in argument, "I don't need to come
in here to Court and say, bad cop, bad cop, [I] don't believe
that.  The simple fact is these two officers have nine months of
experience between them. . . .  I think what happened was,
adrenalin[e] took over, . . . and the Fourth Amendment went out
the window."


     Further, as discussed <u>infra</u> in the text, Virginia law
recognizes a right to resist an arrest involving excessive force,
and this right did not apply under the facts of this case.

frisk violated the Fourth Amendment's prohibition against unreasonable searches and seizures, the evidence establishes that "appellant was arrested after [Deputy Dollar] discovered the mari[j]uana in his [pocket]. [Deputy Dollar] then had probable cause to believe that a [crime] was being committed in [his] presence. The warrantless arrest was therefore lawful, in itself," even if unlawful in a "derivative sense." Id. at 1364-65; see Code § 19.2-81. Assuming without deciding that appellant would have been privileged to use reasonable force to resist the entry or the weapons frisk or both, see Hill, 37 Va. App. at 6-7, 553 S.E.2d at 532, appellant lost the privilege to resist his subsequent arrest once Deputy Dollar discovered marijuana in his possession, even if Dollar's discovery of the marijuana resulted from an unreasonable entry and search.

### 2. Force Used to Effect the Arrest

"[W]hen an officer attempts to arrest a person charged with a felony and uses more force than is reasonably necessary to make the arrest, the officer himself becomes a wrongdoer and the person whose arrest is sought, if himself without fault, can resist such excessive force . . . ." Palmer, 143 Va. at 602-03, 130 S.E. at 401. Whether the force used is reasonable is a mixed question of law and fact. See Brown, 27 Va. App. at 117, 497 S.E.2d at 530. In reviewing the factual predicate for the trial court's ruling, we view the evidence in the light most favorable to the Commonwealth. See Smith, 30 Va. App. at 740, 519 S.E.2d at 832.

None of Deputy Dollar's or Deputy Sexton's actions constituted excessive force in light of appellant's attempts to

resist. Fields testified that Deputy Dollar pushed appellant's head into a window unnecessarily while frisking appellant for weapons. However, the fact finder was entitled to reject Fields' explanation as to how the window was broken and to conclude that the damage occurred either prior to Dollar's encounter with appellant or, if during the encounter, in an accidental fashion. Further, even accepting Fields' testimony as to what occurred during the weapons frisk, Fields admitted that appellant refused to comply with Deputy Dollar's request to him to remain still during the frisk, permitting the inference that Dollar was simply attempting to maintain control of appellant and did not use unreasonable force in doing so. Finally, Deputy Dollar's use of force during the weapons frisk did not entitle appellant to resist the subsequent arrest for marijuana possession by assaulting and battering the deputies. Assuming without deciding appellant was entitled to resist the frisk because it was not supported by reasonable suspicion, see Hill, 37 Va. App. at 6-7, 553 S.E.2d at 532, the arrest itself was based on probable cause resulting from Dollar's discovery of the marijuana.

When Deputy Dollar told appellant he was placing appellant under arrest, appellant refused to submit to Deputy Dollar's authority. Instead, appellant said he was "just there to get some more of his belongings," including "his gun," and he walked to the back of the house "at a real quick pace." When Deputy Dollar "[got] ahold of [appellant]" from behind, appellant refused to cooperate, despite Dollar's verbal instructions and efforts to subdue appellant physically. Only then did Dollar use his baton, striking appellant on the thigh and leg, but appellant

"was still fighting and kicking." When Deputy Dollar slipped, appellant struck him across the face and placed him in a "choking headlock" which restricted Dollar's ability to breathe.

Dollar was very concerned for his safety at that time, as was Deputy Sexton when he entered the kitchen and found appellant had Deputy Dollar in a headlock. As Deputy Sexton attempted to assist Dollar, appellant struck Sexton in the ribs. Sexton then sprayed appellant with pepper spray in an effort to get appellant to release Dollar. Appellant, clearly recognizing Sexton as a law enforcement officer, said, "That tear gas ain't shit, cop," and continued to resist. When Dollar managed to wriggle free and the deputies tried again to subdue appellant, appellant kicked Sexton in the face and knee. Thus, the evidence supported a finding that, by that point in the altercation, appellant had assaulted and battered both deputies, who had exercised only as much force as was necessary to subdue appellant and take him into custody.

Because the deputies did not use excessive force to arrest and subdue appellant, the amount of force they did use did not entitle appellant to resist.

### III.

For these reasons, we hold the weapons frisk violated the Fourth Amendment because the presence of a bulge in appellant's pocket was insufficient under the facts of this case to provide reasonable suspicion that appellant was armed and dangerous. However, appellant had no right to resist his arrest for possession of marijuana. Thus, we reverse and dismiss the

marijuana possession conviction and affirm the two convictions

for assault and battery of a law enforcement officer.

<u>Affirmed, in part,</u>
<u>and reversed and dismissed, in part.</u>

Benton, J., concurring, in part, and dissenting, in part.

I substantially concur in Parts I. and II.A. and, therefore, I concur in reversing the conviction for possession of marijuana and dismissing the underlying charge.  I do not join in the remainder of the opinion.  For the reasons that follow, I would also reverse and dismiss the assault and battery convictions.

I.

The evidence proved that Benjamin McCracken and Teresa Fields lived together for nearly three years in a house Fields' father owned.  Fields testified that she and McCracken argued about noise she made while cleaning the house and that she called the police because she "had an excruciating headache,    . . . was ill, irritable" and tired of arguing.  Midday, on April 8, 2000, two officers went to the residence in response to Fields' telephone call.  One of the officers testified that they responded to a complaint of "verbal arguing."  No other evidence proved that Fields told the police anything else during her initial telephone call.

When the police arrived, McCracken was putting various personal items in his car.  Fields and McCracken explained that "they'd had [a] verbal argument and that [there] had been no assault."  When asked if he was able to calm the situation, the officer responded, "It seemed to have been not very escalated."

The officers remained while McCracken gathered some of his personal belongings and put them in his car. One officer described the situation as "very peaceful" and said they helped McCracken load some of his items. The other officer testified that McCracken was "very friendly, he agreed to leave, and there were no problems whatsoever." Fields testified that she and McCracken declined "to fill out any type of papers to keep each other away" and said "there was no purpose for that."

McCracken went to his mother's residence and later telephoned Fields. During that conversation, McCracken and Fields were both agitated. McCracken's mother then telephoned Fields to inform her that McCracken was returning to collect more of his belongings. Before McCracken arrived at the residence, Fields telephoned the police dispatcher and requested that the officers return to her home. The officers received the second call about an hour and a half after they had left the residence. Fields testified that she wanted the officers to return because she had to go to work and did not want to be delayed by an argument with McCracken.

The first officer to arrive testified that before entering the residence, he heard neighbors hollering something to him. Fields' sister testified that when she saw the officer having difficulty opening the screen door, she called to him that "the front door drags." The officer testified that he heard Fields and McCracken "verbally arguing back and forth when he walked up on the porch." Fields testified, however, that she was talking to McCracken and that they were not arguing. The officer drew his weapon and walked into the house without knocking.

II.

McCracken contends the officers did not have either probable cause to believe a crime was being committed or exigent circumstances to justify their entry. The Commonwealth responds the "officers had probable cause at the time of their warrantless entry to believe that cognizable exigent circumstances were present."

The United States Supreme Court has held that, "absent probable cause and exigent circumstances, warrantless [entries and] arrests in the home are prohibited by the Fourth Amendment." Welsh v. Wisconsin, 466 U.S. 740, 741 (1984); Payton v. New York, 445 U.S. 573, 590 (1980). "[W]arrantless entries into dwellings, followed by searches, seizures, and arrests therein . . . are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances." Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752-53 (1985); Welsh, 446 U.S. at 750. Furthermore, "[e]xigent circumstances justify a warrantless entry . . . only when the police have probable cause to obtain a search warrant." Alexander v. Commonwealth, 19 Va. App. 671, 674, 454 S.E.2d 39, 41 (1995).

The trial judge found that the officers acted reasonably in entering the residence and denied the motion to suppress. His findings included the following:

> There is no question or at least I haven't heard any evidence that would cause the Court to believe that the first call was not made by her complaining about the conduct of [McCracken].  The officers responded.  When they got there, evidently a reasonable inference would be that . . . Fields and [McCracken] had come to some sort of agreement.  The officers testified that there was no fighting or arguing, that he was in the process of removing his property.  He was cooperative, he was loading his vehicle, his personal items, some of his stereo equipment.  The officers even assisted him.  So there is no evidence of any ill feeling or ill will from the first call.  But the fact remains that . . . Fields called for help the first time. . . . Shortly thereafter, an hour or hour and a half later, a second call comes in.  And the evidence is unrebutted that [McCracken] is back on her property where he was living with her.  And the Jury has heard evidence that there was screaming on the outside, one of the officers heard it, the other one didn't.  Officer Sexton says he didn't.  And when they go inside of the house, the Court is of the opinion that that was reasonable.  I mean, here you had a second call where the officers thought [McCracken] was leaving and was cooperative and left.  Now he's back on the scene.  And the owner of the property is calling the officers again for assistance.  They respond.  They come in, they observe, they know there's been prior problems.

We have held that a call to the police dispatcher for assistance does not, without more, give rise to probable cause to believe a crime is occurring.  Id. at 674-75, 454 S.E.2d at 41.  Indeed, the evidence proved that when Fields called the police on the second occasion, McCracken had not arrived.  Fields knew the

- 54 -

police dispatcher and told him "that [her problem with McCracken] was just verbal."  She testified that she reported no crime, that she expected no trouble from McCracken, and that she wanted the officers there because she had to go to work and did not want to be delayed by an argument with McCracken.  Thus, she had not given the police dispatcher or the officers any basis to believe McCracken would do anything other than continue to gather his property.  "Probable cause for police officers to enter a person's [residence] must be based on more than speculation, suspicion, or surmise that a crime might be in progress."  Id.

The evidence also proved that when the police arrived in response to the first call from Fields, McCracken had made no threats.  Although he and Fields had had an argument, the officers testified that matters were peaceful and non-threatening.  The evidence proved Fields had not even expressed fear of McCracken when she first called the police.  Thus, the officers could not reasonably infer from their first visit to the house or the call before their second visit to the house that when McCracken returned to remove more of his property he either posed any threat to Fields or would commit a crime.  Simply put, this evidence failed to prove the officer had probable cause to believe a crime had been or was being committed when he made the warrentless entry into the home.

In addition, the principle is well established that "no amount of probable cause can justify a warrantless [entry into a home] . . . absent 'exigent circumstances.'"  Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971); Payton, 445 U.S. at 590.  "Before agents of the government may invade the sanctity of the

home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh, 466 U.S. at 750. The evidence proved that McCracken had never physically abused Fields and that she had no fear of him. Moreover, Fields did not tell the police dispatcher McCracken had threatened her. She testified she has known the dispatcher "for years" and told him her only concern was the arguments. She merely wanted someone there to prevent another argument. Although the trial judge could believe the officer's testimony that he heard argument and disbelieve Fields' testimony that she and McCracken were not arguing, the mere occurrence of an argument is not indicative of a threat to life or serious injury. The officer had no other basis to believe an emergency existed. As in Shannon v. Commonwealth, 18 Va. App. 31, 34, 441 S.E.2d 225, 226, aff'd on reh'g en banc, 19 Va. App. 145, 449 S.E.2d 584 (1994), and Alexander, this evidence contains no basis upon which the police officers could have concluded that an emergency existed. Thus, the Commonwealth failed to meet its "heavy burden" of proving exigent circumstances existed justifying the warrantless entry. Alexander, 19 Va. App. at 674, 454 S.E.2d at 41.

                                III.

    "At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh, 466

U.S. at 748 (citation omitted).  "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." Payton, 445 U.S. at 589-90.  Thus, the Supreme Court has reiterated that it "held in Payton . . . that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him."  Minnesota v. Olson, 495 U.S. 91, 95 (1990).

Indeed, the principle is well established and long standing that an unlawful, warrantless entry by a police officer into a residence renders void an arrest which is founded upon a discovery inside the residence after the unlawful entry.  Johnson v. United States, 333 U.S. 10, 15-17 (1948); see also Welsh, 466 U.S. at 748-50; Payton, 445 U.S. at 588-90; Jefferson v. Commonwealth, 27 Va. App. 1, 18, 497 S.E.2d 474, 482-83 (1998) (holding that the "arrest of appellant . . . executed after the officer entered the curtilage of appellant's home without a warrant . . . violated the Fourth Amendment").  The purpose of these decisions, holding the arrests to be void, is "to protect [the] home from entry."  Olson, 495 U.S. at 95.

> An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine "the right of the people to be secure in their persons, houses, papers, and effects," and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.

Johnson, 333 U.S. at 17 (footnote omitted).

"It has long been held in Virginia that where an officer attempts an unlawful arrest, the officer is an aggressor which gives the arrestee the right to use self-defense to resist so long as the force used is reasonable."  See Brown v. Commonwealth, 27 Va. App. 111, 116-17, 497 S.E.2d 527, 530 (1998).  This principle of law treats the unlawful arrest as an unauthorized touching and, thus, a battery against the attempted arrestee.  Thus, the Supreme Court has held that where an officer attempts an unlawful arrest, the arrestee "could resist with such reasonable force as was necessary to repel that being exercised by the officer in that undertaking."  Broaddus v. Standard Drug Co., 211 Va. 645, 652, 179 S.E.2d 497, 503 (1971).

The evidence proved that McCracken initially resisted being searched and then attempted to maneuver his way around the officer after the officer sought to arrest him.  Because the arrest of McCracken was made after the police had unlawfully entered the home without a warrant, McCracken had a right to use reasonable force to resist any of the officer's conduct.  The encounter escalated to a physical altercation only when the officer jumped onto McCracken's back.  See Hill v. Commonwealth, 37 Va. App. 1, 7, 533 S.E.2d 529, 532 (2001) (holding that striking an officer after being assaulted by the officer during an unlawful arrest was not excessive force).

The events that gave rise to the search and arrest all occurred within the home, after the officers had unlawfully entered the home and upon the officer's discovery of evidence within the home during that unlawful entry.  This is precisely the circumstance the Supreme Court's decision in Payton barred by

- 58 -

holding that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" 445 U.S. at 585 (citation omitted). The rule in Payton was derived from the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Id. at 601. By drawing a line at the entrance to a home, the Fourth Amendment protects the physical integrity of the home. As the Court noted in Johnson, "officers . . . thrust[ing] themselves into a home is . . . a grave concern not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." 333 U.S. at 14. Based on the unlawful entry, McCracken was not unreasonable in his attempt to resist the unlawful arrest and did not use excessive force in resisting.

                                    IV.

For these reasons, I would hold that the officer's warrantless entry into the residence violated the Fourth Amendment. That unlawful entry negated the officer's authority to make an arrest for events occurring inside the home. Therefore, I would reverse all the convictions and dismiss the indictments. See Alexander, 19 Va. App. at 675, 454 S.E.2d at 41.

Bumgardner, J., dissenting, in part, and concurring, in part.

I do not believe the police acted unreasonably and, therefore, conclude the trial court did not err. While I concur in the decision to affirm the convictions of assault and battery, I do not join that opinion.

Police officers responded to a domestic disturbance call from Teresa Fields because she wanted the defendant removed from her house. The defendant left voluntarily the first time. Ninety minutes later, Fields placed a second call to the 911 emergency dispatcher because the defendant was returning to her house. When the officers responded, neighbors were screaming that the defendant was inside, and the officers heard him inside arguing.

If the first officer had not entered Fields' house immediately and investigated the domestic disturbance complaint, he would have been derelict. Before entering the front door, the officer had probable cause to believe the defendant was trespassing, Code § 18.2-119, and at least, reasonable suspicion of assault on a family member, Code § 18.2-57.2.[10]

After the officer entered, he saw the bulge in the defendant's pocket. The defendant did not cooperate and refused to put his hands on the wall. When the defendant finally

_____

[10] In recognition of the difficulty of protecting against domestic violence, the General Assembly increased the duties of law-enforcement officers when responding to such incidents. See Code § 19.2-81.3. Police are entitled to arrest without a warrant when the violation does not occur in their presence. They must arrest "the primary physical aggressor" if they develop probable cause unless special circumstances exist. The police must make written report of any incident in which they have probable cause that "family abuse" occurred and written explanation of the special circumstances if they do not arrest.

complied by putting his hands on the love seat, the officer patted the defendant's pocket.  At that point, the officer was "authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop."  United States v. Hensley, 469 U.S. 221, 235 (1985).  The officer felt a hard, rigid object, and when trying to remove it, the officer pulled out a bag of marijuana.  From that point, the officer had probable cause to arrest for possession of marijuana, and the defendant had no right to resist.

I believe the decisions to reverse the trial court fail to view the evidence in the light most favorable to the Commonwealth.  By failing to take the appropriate appellate perspective, each permits the lens of hindsight to distort its inspection of the reasonableness of the police response to this emergency call.